# CASES DETERMINED

AT THE

# January Term, 1912.

MENOMINEE RIVER BOOM COMPANY, Respondent, vs. AUGUS-
TUS SPIES LUMBER & CEDAR COMPANY, Appellant.

*October 6, 1911—January 9, 1912.*

*Public-service corporations: Rates: Uniformity: Construction of stat-
utes: Franchises: Boom companies: "Toll or boom charges:"
"Storing, sorting and delivering" logs: Contracts for excessive
rates: Validity: Ratification: Recovery* quantum meruit.

1. In the absence of a prohibitory statute a public-service corpora-
   tion may make a discrimination in rates when such discrimina-
   tion is founded upon a reasonable difference in conditions at-
   tending the several transactions, but otherwise it must treat
   all alike, especially where it enjoys a substantial monopoly.
   To different persons dealing with it under substantially similar
   circumstances its charges must be uniform.
2. Statutes conferring privileges or franchises are construed strictly
   against the grantee of the franchise and in favor of the public.
   *Janesville B. Co. v. Stoughton,* 1 Pin. 667.
3. Under sec. 1777e, Stats. (1898),—declaring that the corporations
   therein mentioned shall be subject to the conditions, limita-
   tions, and restrictions imposed upon log-driving corporations
   by sec. 1777 so far as applicable, "excepting in the cases
   wherein special provisions relating thereto are herein made,"—
   a paragraph in sec. 1777 relating to services performed upon
   request of the log owner is excluded, as being within the ex-
   ception, by special provisions in sec. 1777e covering and regu-
   lating in a different manner the same subject.

4. Where sec. 1777e gave to a boom company exclusive possession of part of a river for storing, sorting, and delivering logs, and authorized it to collect "toll or boom charges" and provided that such corporation should be subject to the conditions, limitations, and restrictions of sec. 1777 so far as applicable, a requirement contained in sec. 1777 that tolls should be reasonable and uniform applies to the "toll or boom charges" mentioned in sec. 1777e.

5. In the phrase "toll or boom charges" in sec. 1777e the word "or" is used in the sense of "alias."

6. The powers and duties of a corporation under sec. 1777 are distinct and separate from those provided for in sec. 1777e.

7. Boom companies under sec. 1777e are not common carriers in the full legal sense of that term, although they present some analogies; but they are public-service corporations having their compensation regulated and the maximum thereof fixed by statute.

8. The charges of such corporations must be reasonable and uniform and not exceed fifty cents per thousand feet.

9. "Storing, sorting and delivering," within the meaning of sec. 1777e, is one process for which a reasonable uniform charge not exceeding fifty cents per thousand feet may be made; and this operation cannot be separated into as many different processes as there are log owners or delivery gaps and a different rate made at each gap.

10. Such public-service corporations cannot make valid contracts for tolls or boom charges which are not uniform or which are in excess of the maximum fixed by law.

11. Nor can they, by adding to the public service some additional service for which they may charge whatever the parties agree upon, uphold the contract upon the ground that all that part of the charge in excess of the legal maximum will be taken to be for the private service.

12. A contract prohibited by statute is usually void, even though no penalty be imposed upon the contracting parties or either of them.

13. A contract by a public-service corporation for compensation not uniform and in excess of the legal maximum will be held invalid and incapable of ratification, where suit is brought thereon by the corporation against one for whose protection the statutory requirement of uniformity and the statutory maximum of charge were made.

14. Where the services rendered are not themselves illegal nor performed in consequence of the illegal contract, although the court refuses to enforce the contract the corporation which performed the service may recover what it was reasonably worth at a uniform rate not exceeding the amount limited by statute. MARSHALL and BARNES, JJ., dissent.

APPEAL from a judgment of the circuit court for Marinette county: S. D. HASTINGS, Circuit Judge. *Reversed.*

Pierre Martineau, for the appellant.

For the respondent there was a brief by *Cary, Upham & Black,* and oral argument by *W. E. Black.*

The following opinion was filed October 24, 1911:

TIMLIN, J. The respondent is averred and admitted to be a corporation formed by the consolidation, pursuant to sec. 1777, Stats. (1898), and Act No. 91 of the Laws of Michigan for 1887, of a Wisconsin corporation, called the Menominee River Boom Company, and a Michigan corporation of the same name. It is authorized to engage in, and is engaged in, driving, holding, sorting, and delivering logs and timber on the Menominee river, the channel of which, up to the Brule river, forms the boundary line between Wisconsin and Michigan. It has and exercises powers of driving logs under sec. 1777 and powers of storing, sorting, and delivering under sec. 1777e. The president of the appellant is a member of the board of directors of the respondent and participated in a meeting of the directors of respondent on March 14, 1908, at which meeting, with the consent of the president of appellant, it was resolved that a fixed rate per thousand feet be charged for driving logs, the rate to be made at the directors' meeting when the "boomage and toll charges" are made. It was customary to hold annually a meeting of these directors for the purpose last mentioned. A meeting of these directors was accordingly held on June 11, 1908,

VOL. 147 — 36

at which the driving charges or rates were fixed and the following:

*"Boomage charges.* For boomage charges, including ordinary sacking, scaling, temporary use of the Upper Storage (as available), dividing and delivering of logs into the log pockets in the Menominee river, the following rates per thousand feet according to the Doyle rule of measurements as scaled by this company will be charged, namely:

For delivery into log pockets of:                                    Rate per M.
  Marinette & Menominee Paper Co. below dam 3..... 38 cents.
  N. Ludington Co. ..................................... 40    "
  Stephenson Manufacturing Co. ...................... 40    "
  Hamilton & Merryman Co. .......................... 45    "
  Merryman Manufacturing Co. ....................... 50    "
  Sawyer Goodman Co. ............................... 54    "
  Marinette Lumber Co. .............................. 54    "
At the Rafting Gap made up in ordinary sized rafts for
  immediate delivery at that point to the proper owner
  or authorized agent .............................. 80    "

*Ties, posts, and poles.* Charges for tolls, driving, and boomage on ties, posts, poles, and pulpwood are the same as on logs and are figured on the following basis:

Ties ..................................................... 20 to M.
Posts 7 to 16 ........................................... 50 to M.
Poles 18 and 20 feet .................................... 35 to M.
Poles 25 and 30 feet .................................... 25 to M.
Poles 35 and 40 feet .................................... 15 to M.
Poles 45 to 50 feet .....................................  3 to M.
Poles 55 to 60 feet .....................................  2 to M.
Pulpwood ............................................... 1 cord to M.

The foregoing rates will cover all ordinary expense of handling logs and other materials to the several points of delivery, provided the logs are properly and promptly cared for as fast as delivered into the log pockets, and are receipted for and towed away without unnecessary delay as soon as made into rafts at the Rafting Gap. On logs or other material divided above the third dam on Menominee river, special arrangements as to charges will be made, based on the service performed for such work, the same as heretofore in lieu of fixed charges per thousand feet.

*Log pockets.* For extra labor on logs in storage separating marks of one sort, counting of different marks, or any un-

usual expense, an additional charge of twenty cents per hour per man will be made.

*Watching rafts.* The total monthly expense of watching rafts each month to be prorated on the hours employed watching each raft.

*Use of towing booms.* For use of towing booms ten cents per hour per set, to be charged for from the time put into use, and when returned to Rafting Gap empty—with a further proper charge for loss of chain, rope, etc., or for damage done."

The president of appellant at this meeting objected to the last item in the first schedule 'above; voted against it and left the meeting. A copy of this document was soon after sent to the appellant. The latter retained this copy until August 20, 1908, when it was returned to respondent signed and verified by appellant's president and secretary. This paper contained a statement of logs, ties, posts, etc., banked by appellant and to be driven down the Menominee river which aggregated 15,564,399 feet board measure, and among other things the following:

"The said boom company is hereby requested and authorized to drive, boom, and handle all the logs herein referred to, together with any logs of previous years, concurrently with logs of other owners, upon terms and stipulations in circular letter of said company, dated June 11, 1908, which forms part of this blank, and to deliver the same as we have already or may hereafter order, or in default of such order to care for the same as in the judgment of said company the interest of all log owners may require.

"I have read the foregoing statement and do not subscribe or make affidavit as a mere formality, but with a firm belief in the correctness of the statement made."

The logs had been driven down the river to the place for separation and delivery and some deliveries made to the appellant prior to June 11, 1908. Deliveries continued up to and after August 20, 1908, the appellant receiving the same without protest and making partial payments thereon, so

computed, however, as not to equal eighty cents per thousand feet board measure. The respondent, after having completed the sorting and delivery, brought this action upon the contract above set forth to recover a balance of $6,217.01 still unpaid. The appellant answered, among other things, that the charges of respondent were unreasonably high and above the maximum of fifty cents per thousand feet allowed by law, and also that the charges were not uniform but wrongfully discriminated against the appellant and in favor of mill owners to whom deliveries were made farther up stream, and that such mill owners controlled the stock and board of directors of respondent. Another line of defense was that the appellant did not sign the verified statement of August 20, 1908, as a contract, but for the sole purpose of informing the respondent of the amount of timber it had to be driven down stream, and that this instrument was without legal consideration and the charges specified in excess of the maximum allowed by law, and respondent was in possession of this part of the river, and appellant could not itself separate the logs and would suffer great injury and loss if respondent refused or delayed to deliver promptly.

Sec. 1777e, Stats. (1898), provides that:

"Any corporation formed under this chapter for the improvement of any stream and storing, sorting and delivering thereon saw logs, square and round timber or other timber thereon which shall have taken prior possession of such stream or portion of stream for that purpose shall have the exclusive power to improve such stream or portion thereof . . . by constructing all such booms of all kinds as may be necessary or suitable for the purposes aforesaid." "Every such corporation shall have all the powers, grants and privileges, including the right to collect toll or boom charges, and have liens therefor, and be subject to all the conditions, limitations and restrictions conferred, imposed or provided by said section 1777 upon corporations for the improvement of streams and driving logs thereon, so far as the same may be applicable, excepting in the cases wherein special provisions relating thereto are herein made."

Sec. 1777, Stats. (1898), there referred to, provides that the corporation formed for driving logs, etc., "may charge and collect reasonable and uniform tolls upon all logs, lumber and timber driven or floated on the same." The last mentioned section contains an additional provision as follows:

"And shall also, at the request of the owner of any logs and timber put into said stream, take charge of the same, and drive the same down and out of such stream, and charge and collect therefor of the owner or party controlling said logs and timber reasonable charges and expenses for such services."

This section 1777e further declares that "the provisions of sections twelve, thirteen, fourteen, fifteen, sixteen, eighteen and twenty-four of chapter forty-five of the private and local laws of Wisconsin for the year 1871, entitled an act to incorporate the Wausau Boom Company, as the same are amended, shall apply to corporations formed hereunder." Sec. 12 last mentioned provides that the boom company shall publish in a newspaper for three successive weeks prior to the first day of April in each year a notice to log owners containing certain specified information. Also that all log owners desiring to have logs or timber retained or stored in such booms shall, on or before April first in each year, file with the secretary of the company a statement in writing and subscribed by such person, setting forth that he desires his logs or timber retained or stored in said booms, specifying as near as may be the number and quantity and the particular marks or brands thereon, and the company shall be under no obligation to receive, retain, or store any logs or timber the owners of which have not complied with the foregoing provisions. This expressly covers with reference to boom companies what is covered with reference to log-driving companies by the last quoted excerpt from sec. 1777. Sec. 13 above mentioned authorizes such companies to collect upon all logs and timber received, retained, or stored in their said booms such sum as may be determined upon and provided by the board of directors, not exceeding the sum of fifty cents per thousand feet. A lien is

given to secure this charge. Sec. 15 provides that the stock-holders of said company shall have no preference over any other persons in the storage of their logs and timber in said boom; also that the logs are to be scaled at the lower dividing boom by the scaler.

The respondent, as heretofore mentioned, is also engaged in driving logs, but that power and that service are separate and distinct from its authority and its services as a corporation under sec. 1777e, and no question is made in this suit respecting the driving charges, and none of the driving charges are included in those covenants of the contract upon which this suit is brought. There is no substantial controversy in the evidence relating to the right of recovery, although there is a controversy relating to the proper amount to be recovered. For many years prior to 1890 the respondent charged to all log owners an uniform rate for storing, sorting, and delivering logs within the boomage ground. Since 1890 and for the season in question the charges of the respondent for "sorting and delivering," as the statute expresses it,—"dividing," as the respondent called it,—were fixed as follows: In a distance of something over a mile on a straight line from the point where the sorting and delivery commenced there were the delivery boom pockets of log owners having mills in the vicinity. Each was furnished or furnished himself with one or more pocket booms into which his logs were to be delivered by respondent. At each of these points of delivery there was an opening called a gap in the floating timber fences, called booms, and at each of these gaps a partial separation of the logs was made. At each of these gaps men were stationed who separated from the floating and mingled mass the logs of the owner at whose gap the logs in their course down the river had arrived, and turned them into the pocket boom of that owner, and also turned the remainder of the unseparated mass into the opening, which would permit them to float down river between parallel boomsticks running lengthwise or nearly

lengthwise of the river until the next gap was reached, where there was a like partial separation by withdrawing from the mass the logs of that owner and permitting the mingled remainder of the logs to pass down the river until the next gap was reached, where the operation was repeated. At the so-called railroad gap (being the third or fourth gap) the logs belonging to owners who required delivery on the Michigan side of the river were separated from the logs to be delivered on the Wisconsin side, but not otherwise separated, and from this point the Michigan logs of the various owners on that side passed commingled down river to the first gap below the railroad gap, where a partial separation was made by subtracting from that mass the logs of that owner, and this operation was repeated until appellant's logs were delivered wholly separated after the fifth or sixth of such partial separations. As the logs moved down the river from gap to gap some work was necessary to prevent clogging and keep them moving. The respondent kept account of the expense at each gap and prorated that on all the logs which reached that point, including those there delivered and those which passed down in the mingled mass; but logs once delivered at any upper gap were not charged with any further expense of the whole separation. The expenses of the lower gaps tended somewhat to diminish, but the quantity of logs on which the expenses were prorated diminished in greater proportion, so that there was, including the *pro rata* charges of the upper gaps with which such logs were burdened, a rising scale of expense per thousand feet, substantially similar but not equal to that heretofore set forth in this opinion, as separation was made and logs delivered into the pockets farther down stream. In this manner and basing it on the expenses so ascertained and apportioned, the respondent made and fixed the variable schedule of charges mentioned, which, it will be observed, runs from thirty-eight cents per thousand feet at the first to forty cents per thousand feet at the second place of delivery and

eighty cents per thousand feet at the rafting gap, the place of delivery for appellant's logs.    This last includes a charge per thousand feet for rafting (that is, making up into rafts), the amount of which was not fixed or agreed upon separately, but which the respondent now claims to have been reasonably worth nineteen and one-half cents per thousand feet and the appellant ten cents per thousand feet.    In the first case the charge against the appellant for storing, sorting, and delivering would be sixty and one-half cents per thousand feet, in the second case seventy cents per thousand feet.    The respondent also contends that there is included in this some indefinite amount for separating cedar poles, ties, etc., from saw logs, but the appellant contends that similar separations were made for other log owners without extra charge.    Other items of expense and other fractions of the total charges above mentioned, such as sacking, scaling, storage, general expense, and stray logs, were distributed *pro rata* at so much per thousand feet on all the logs received by the respondent, no matter where delivered.

We do not think the statute contemplates or permits any such distribution of charges.    The duty of the respondent is to sort and deliver in that part of the river of which it has exclusive possession for that purpose.    If by reason of the configuration of the river this can best be done by the method of making a partial separation at each gap and there delivering the logs of one owner, this is merely for the convenience of the respondent and to facilitate separation.    The sorting and delivery, as it is called in the statute, or the dividing, as the respondent calls it, is one process, not several processes, even though it be carried on for convenience of the respondent at different points in the river as the logs float downward.    The mere fact that respondent avails itself of the current and that the pocket booms are situated at different points along the bank has no influence to separate this sorting and delivery into a dozen or a half dozen different items or processes.    The

duty of the respondent is to sort out the logs of each owner and deliver them.   If it can more easily or cheaply perform this duty by separating the logs of one owner from the mass at one point in the downward course, and separating the logs of another owner at another point down the river, it may no doubt adopt this method; but by adoption of this method, or because the method is the most feasible and practical one under the circumstances, the operation of sorting and delivering is not divided into as many distinct acts or operations as there are pocket booms on that part of the river within the possession of the respondent.

In the absence of a prohibitory statute a public-service corporation may make a discrimination in rates when such discrimination is founded upon a reasonable difference in conditions attending the several transactions, but otherwise it must treat all alike, especially where it enjoys a substantial monopoly.   But to different persons dealing with it under substantially similar circumstances its charges must be uniform. *Atchison, T. & S. F. R. Co. v. D. & N. O. R. Co.* 110 U. S. 667, 4 Sup. Ct. 185; *State ex rel. v. C., N. O. & T. P. R. Co.* 47 Ohio St. 130, 23 N. E. 928, 7 L. R. A. 319; *Doty v. Strong,* 1 Pin. 313; *Ayres v. C. & N. W. R. Co.* 71 Wis. 372, 37 N. W. 432; *Goodridge v. U. P. R. Co.* 35 Fed. 35.   There is here no reasonable difference in conditions.   Bearing this common-law rule in mind, and considering that the words "tolls or boom charges" (not tolls and boom charges) are (except the restriction) the only provisions found in sec. 1777*e* relating to the charges or compensation of the boom company, it is fair to assume: (1) that this charge is for the "storing, sorting, and delivering" mentioned in that section; and (2) that this charge is governed by the requirement of uniformity found in sec. 1777 with reference to tolls.   "Or" is usually disjunctive; occasionally, to avoid absurdity, it is construed as a conjunctive and equivalent to "and," but it also is used in the sense of "alias," as in the phrase "a violin

or fiddle." Standard Dict. It is in the latter sense that it is used here. This is how it was understood by the respondent when, in the instrument of June 11th from which excerpts have been quoted, it fixed its boomage charges covering the whole charge for storing, sorting, and delivering, and when it mentioned in its resolution the directors' meeting to be held in the future "when the boomage and toll charges are made." Other and more general rules relating to grants of franchises and privileges corroborate this construction. *Janesville B. Co. v. Stoughton,* 1 Pin. 667; 19 Cyc. 1459. Tolls, by sec. 1777, are required to be uniform, and that requirement applies to the tolls or boom charges mentioned in sec. 1777e. That requirement cannot reasonably be limited to the word "tolls" in sec. 1777e, as it may in sec. 1777, because the latter section provides for certain services at the request of the owner of logs, which services are to be compensated reasonably and may or may not be included in the "tolls." In sec. 1777e tolls or boom charges are the same thing. The above quoted paragraph from sec. 1777 relating to services performed upon request of the log owner is not a part of sec. 1777e, because by sec. 12, ch. 45, P. & L. Laws of 1871, expressly adopted in and made a part of sec. 1777e, there are special provisions covering and regulating in a different manner this same subject, and by sec. 1777e the provisions of sec. 1777 are to obtain and govern in the cases covered by sec. 1777e only so far as applicable, and then only where no special provisions are otherwise made. But even if it were otherwise the charges must in any event be reasonable, and a charge or rate cannot be said to be reasonable which is unreasonably discriminatory.

As we construe the statute, it requires the respondent to make uniform charges for sorting and delivering, and under the plan adopted and above described the charges are not uniform. The fraction of the whole expense of sorting and delivering at each gap is distributed uniformly on the logs

which arrive at that gap whether delivered there or not. But
this does not meet the requirement of uniformity, because
uniformity in the statute applies to the whole charge for sort-
ing and delivering, and not to arbitrary fractions of that
charge based on expenses at any point where the respondent
finds it convenient to establish a gap.

Now the statute further forbids a charge in excess of fifty
cents per thousand feet. When the evidence was in it ap-
peared without contradiction, therefore, that the contract
upon which the suit was brought was based upon charges not
uniform and upon an agreement to pay more than fifty cents
per thousand feet; that is to say, a contract made in violation
of two several statutory prohibitions. A contract made in
violation of a statute or for performance of an act which is
prohibited by statute is void and will not be enforced by the
court. This is true whether there is a prohibition and a pen-
alty or merely a prohibition. *Presbyterian M. Fund v.
Thomas,* 126 Wis. 281, 105 N. W. 801; *Ætna Ins. Co. v.
Harvey,* 11 Wis. 394; *Melchoir v. McCarty,* 31 Wis. 252;
*Laun v. Pac. Mut. L. Ins. Co.* 131 Wis. 555, 111 N. W. 660,
9 L. R. A. N. s. 1204. See, also, cases collected in note to
*Levinson v. Boas* (150 Cal. 185, 88 Pac. 825) in 12 L. R. A.
N. s. 575. A contract contrary to the terms of a statute is not
enforceable in court. *Jemison v. B. & A. R. Co.* 125 Ala.
378, 28 South. 51; *Raleigh & G. R. Co. v. Swanson,* 102 Ga.
754, 28 S. E. 601, 39 L. R. A. 275. If any part of the con-
sideration for a promise be illegal, or if there are several con-
siderations for an unseverable promise one of which is il-
legal, the promise, whether written or oral, is wholly void, as
it is impossible to say what part or which one of the consider-
ations induced the promise. *Trist v. Child,* 21 Wall. 441;
*Meguire v. Corwine,* 101 U. S. 108; *Pacific G. Co. v. Mul-
len,* 66 Ala. 582; *Bishop v. Palmer,* 146 Mass. 469, 16 N. E.
299. The contract is void if it is only in part connected with
the illegal transaction and the promise single or entire.

*Swartzer v. Gillett,* 2 Pin. 238; *United B. Church v. Vandusen,* 37 Wis. 54; *Fernekes v. Bergenthal,* 69 Wis. 464, 34 N. W. 238.     See, also, with reference to a public-service company, *New Orleans G. L. & B. Co. v. Paulding,* 12 Rob. (La.) 378.     The appellant, being one of the persons to be protected by the limitation of charges made in this statute, may raise the objection.     *Laun v. Pac. Mut. L. Ins. Co.* 131 Wis. 555, 111 N. W. 660.     Objection to the illegality of this contract could not be waived by making or ratifying the contract, otherwise the statute would be ineffectual; besides, the respondent itself traces its right of action here through this illegal contract.     *Levinson v. Boas, supra,* and cases in note.

This is not the case of suing to recover back excessive charges exacted by a carrier or public-service company by duress of goods or under the necessity of securing transportation thereof, such as *Ill. G. Co. v. Chicago T. Co.* 234 Ill. 535, 85 N. E. 200, 18 L. R. A. N. s. 124, and cases in note. In that class of cases there is some apparent conflict with reference to what is and what is not a voluntary payment. (Cases in note last referred to.)     In the case at bar the respondent sues to recover money due under a contract executed on its part but not fully executed on the part of the appellant, and this contract was made in violation of a prohibitory statute, and the objection to the recovery is made by one who joined in the contract but for whose benefit the statutory restrictions were established.     The contract is not severable in the sense that we can separate the valid from the invalid portions thereof.     The same consideration goes to the whole contract.     *Martin v. Estate of Martin,* 108 Wis. 284, 84 N. W. 839.

Cases are cited to show that the respondent is not a common carrier.     Within the full legal meaning of these words it probably is not.     *Mann v. White River L. & B. Co.* 46 Mich. 38, 8 N. W. 550; *Chesley v. Miss. & R. R. B. Co.* 39 Minn. 83, 38 N. W. 769.     These cases hold that similar companies are

not subject to the rule of absolute liability of a common carrier to deliver goods intrusted to it for carriage. But they concede that in other respects there is some analogy. It is sufficient for the instant case that the respondent is a public-service corporation and has exclusive control of the river at the place in question. We are not willing to hold that such corporation, having its charges limited by statute, may nevertheless make a valid contract for compensation in excess of the statutory rate by the simple expedient of adding to the public service some service not within the statutory regulation, and by consent of the party served putting such high value on this latter service that the public service may appear to be within the statutory limit when it is not. Here, however, the undisputed evidence shows that the public-service charges exceed the statutory limit after subtracting from the whole charge the highest amount claimed by respondent to be the reasonable value of the other services.

We are urged to fix the amount of respondent's recovery in the event that it is found that respondent cannot recover the full amount recovered in the circuit court. But this we are unable to do because there has been no finding fixing the reasonable value of the additional items of service, consisting of making up the logs into rafts and separating the cedar, etc., from the saw logs, and the evidence is in irreconcilable conflict. Neither have we a showing of all the items which entered into general expense, nor satisfactory evidence going to show whether this separation of cedar, etc., from saw logs was charged up to other log owners or was in their case covered by the general charge for "boomage."

The judgment should be reversed, but the respondent may amend and recover for the storing, sorting, and delivery a reasonable and uniform charge not exceeding fifty cents per thousand feet, less payments made. This can be easily ascertained. The whole amount of feet, board measure, according to respondent's scale, but estimating the ties, posts,

etc., in a reasonable and customary way, divided into the whole reasonable charge not exceeding fifty cents per thousand feet, will give the rate per thousand feet, which may be multiplied by the whole number of feet of appellant's timber arrived at in the same way. The reasonable value of the service of making the logs, etc., up into rafts must be found separately, and also that of each of the other services claimed for and not included in storing, sorting, and delivering. This may or may not include separating cedar, etc., from saw logs according as the evidence may or may not establish that as to other log owners this was included in the charge for sorting. The respondent, notwithstanding its illegal contract, may recover the reasonable value of its services because these services were not illegal and were undertaken and carried out independently of this contract, which fixed the price at an illegal rate after the work was undertaken and partially carried out.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in conformity with this decision.

The following opinion was filed November 7, 1911:

MARSHALL, J. (*dissenting*). I care not to go into the subject, as an original proposition, of whether the court's construction of the boom charter is correct. As I view the case that is not material. Therefore what I may say on that point will be of a somewhat incidental character. If there were a legal contract, in respect to the services respondent performed, involving an agreement as to a disputable question regarding whether it was permissible under the boom charter to make some reasonable classifications of the logs and make the rates for service within the charter limitations uniform between the members of each class, then defendant, upon principle and precedent, is liable upon such contract as the trial court held.

That the boom charter is ambiguous, is conceded. That it

Menominee River B. Co. v. Augustus Spies L. & C. Co. 147 Wis. 559.

is quite so, is demonstrated by the conduct of proprietors and patrons, the expensive litigation in respect thereto, the great difficulty the painstaking circuit judge,—who tried the case and decided it with commendable care and clearness,—found in solving the uncertainty, ending in the case being decided without it, the decision being grounded on competency of the parties to recognize such difficulty and settle by treaty for current business, and, finally, by the trouble here in reading out of the charter the legislative idea, and failure to do that with unanimity. I fully agree with the learned trial court that,—in the face of such troublesome uncertainty as to whether the theory of a uniform rate per thousand feet of all logs handled, is the one written into the charter, as claimed by appellant, or the theory of classification according to essential differences, and a differential uniform rate accordingly, is so written, as charged by respondent,—it was within the competency of the parties to settle the matter by treaty. Principle supports that. Public policy to favor settlements supports it. Judicial condemnation of it, in my judgment, is subversive of both, is unjust to the parties here, and promotive of litigation and uncertainty in similar situations.

True, in general, if the legislature fixes a rate for services which the owners of a public franchise may charge, such owners cannot lawfully contract for a greater rate. But, when there is uncertainty as to such rate, which the proprietors and patrons cannot solve, rendering necessary a choice of modes of conduct between treaty and litigation, the same sound public policy which condemns contracts in violation of a statutory rate which is certain, approves and gives high dignity to fair contractual adjustments of such differences. So far as the decision here overrules that of the trial judge, guided by this salutary doctrine, I most respectfully dissent.

I do not care to spend time demonstrating that there was good ground for the classification. That was very largely a question of fact. The trial judge should not be overruled

on that on the basis of disputable construction, and from a viewpoint which, in the very nature of the case, does not enable one here to understand the situation as clearly as he did. He was not only personally familiar with the situation, but had other legitimate opportunities for understanding it, much superior to those enjoyed by a person who, without technical knowledge of the business, must take a view through a vista of mere printed records and some diagrams.    Looking at the picture made thereby in the light of my own experience in such matters, which, I am warranted in taking the liberty of saying, has not been small, there was good ground for a classification for differential rates.    In any event, I cannot see my way clear to condemn the decision of the trial court on that subject, in face of the undisputed evidence that many able business men,—men whose judgment was of an expert order in a high degree, men including those whose interests were on one side of the matter fully as strongly as those on the other,— by their conduct pronounced judgment years ago in the matter, to the effect that a sound basis for classification existed, and, with practical unanimity, adhered thereto down to the happening of the circumstances of this case.    Here, we may well say, in passing, that the tacit agreement between patrons and proprietors, as to the meaning of the boom charter, should be taken as an efficient construction thereof by the familiar rule of practical construction.

If the situation were such that the plaintiff and defendant were competent to contract for the boomage and other services according to the rates complained of, as I think they were under the circumstances, and as the trial court held, then that they did so contract, and that the decision of the lower court in finding according thereto should be supported, seems quite clear.

A rate of eighty cents per thousand feet of the log scale for all the services, which includes much more than the boomage charges, was made.    The contract as to the rate was entire, in

terms.    The parties intended it to be entire in fact.    That is
evident from their conduct before, at the time of and after it
was made.    The proposal for rendering the services was at a
meeting at which appellant was represented.    No objection
was then made.    It requested the service,—the whole service,
that of a public utility character and that which was not,
without any separation,—knowing, or under the circum-
stances being bound to know, that plaintiff would expect com-
pensation according to the proposal.    Later a meeting was
held at which plaintiff was represented and took part in the
discussion respecting the rate for service.    A determination
was then made,—defendant presently protesting,—that the
rates would be charged as they had been for many years be-
fore and customarily submitted to as legal and just.    All the
services as to defendant's logs were covered by the single rate
of eighty cents per thousand.    Thereafter it was competent
for defendant to have notified plaintiff that it would expect
and only submit to boom charges at the average rate charged
for all.    It did not do so.    Only a little of the season's work
had been done.    In that situation it gave in its list of logs, as
if submitting to the aforesaid proposal and determination.
Later the services were all performed, bills were rendered
and payments made on account, without objection.    In addi-
tion to the foregoing appellant gave defendant a written re-
quest to handle its logs upon the conditions therein stated,
which were the same as had been theretofore proposed and, to
its knowledge, determined upon.    That the trial court read
out of the undisputed facts not only an implied but a solemn
written contract to pay the eighty-cent rate, seems to me to
be most natural.

    I have not taken time to point my statements as to legal
principles by citation of authorities because none of such
statements, in my judgment, are doubtful.    The case does not
deal with an intentional contractual violation of a fixed and
certain legislative rate.    There was no intention, constructive

or otherwise, to violate the law.   It was not a case where the
respondent did, or could have known the law as this court has
now determined it.   So, authorities on that subject seem to
me not to have any bearing.   No authority was cited to the
court, or by the court, or in my judgment exists, condemn-
ing settlements by treaty as to the meaning of a law of the
character of that in question, good as to current or past trans-
actions, or the making, as to such transactions, of a rate cov-
ering the statutory element and others.

After carefully examining the numerous citations in the
court's opinion, referred to as pointing the suggestion that the
agreement here falls within the principle that courts will not
lend their aid to enforce a contract made in violation of
law,—candor compels me to say, I cannot discover that any
of them fit this case.   If the character of the citations ap-
peared by a statement of each case, what I feel called upon
to say in respect to them, would be appreciated.   They all
deal with contracts characterized by some criminal element,
either *malum in se* or *malum prohibitum,* or with contracts
in violation of prohibitory statutes, or contracts of an im-
moral, vicious, or corrupting character, and the rule goes no
further as indicated, particularly, in one of the cases cited,
and the general character of all of them.   *Bishop v. Palmer,*
146 Mass. 469, 16 N. E. 299.

How can the rule as to contracts compounding crimes, or
contracts for influencing public officers, or contracts expressly
prohibited by law, or those of a vicious or immoral character,
or even contracts intended, actually or constructively, to be
in violation of law,—and this covers the whole field,—have
anything to do with a contract made in good faith, according
to a custom of years, in conformity with the judgment of busi-
ness men in general as to the meaning of the law involved,—
illustrated by their conduct with reference to it,—a contract,
at the worst, in compromise of an uncertainty, avoiding ex-
pensive litigation, and without prejudice to future operations,

or involving any element criminal or immoral or vicious,—one involving only the right of a good-faith dispute as to the proper charge for a public utility service, determinable only by agreement, or expensive and perplexing litigation, detrimental to private and public interests?

As courts have often said in dealing with the rule in question, it is one of public policy, in the absence of a statute expressly voiding the contract. When the reason for the rule ceases, the rule no longer applies. Further, when there is a public policy requiring support of a contract, which is equal to or paramount to that condemning it, or there is nothing in the law indicating a legislative intent to render the contract void, it should be held enforceable. That is well illustrated in *Lester v. Howard Bank,* 33 Md. 558; *Bowditch v. New Eng. Mut. L. Ins. Co.* 141 Mass. 292, 4 N. E. 798; *Deming v. State ex rel. Miller,* 23 Ind. 416; *Laun v. Pac. Mut. L. Ins. Co.* 131 Wis. 555, 111 N. W. 660. The court in *Lester v. Howard Bank, supra,* as to some contracts though within prohibitory statutes, said:

"Cases may arise under contracts not inherently immoral, but prohibited by statute, in which the public interest will better be promoted by granting, rather than denying, the relief sought, since public policy lies at the base of the law in regard to illegal contracts, and the rule is not adopted for the benefit of parties but of the public."

In *Deming v. State, supra,* the court, speaking on the same subject, said:

"The rule is properly applied only where the reason upon which it is founded exists. The law ceases with the reason thereof. It is a grave error to regard it as a merely arbitrary rule, applicable to *all* contracts which are prohibited by statute."

Thus, it will be seen, that if the contract in question were prohibited,—instead of allowed and favored in the law,—at the worst, one in settlement, for the time being, of a good-

faith business controversy,—still, the rule should not be applied to this case. As before stated, the public policy which favors settlements as to such controversies is, under the circumstances, paramount to any public demand for judicially condemning such openly had good-faith transactions as occurred here.

I should say, in closing, it is conceded in the opinion, as I understand, that had appellant paid respondent's demand, voluntarily, it could not have recovered back the money. Cases to that effect are cited, particularly *Ill. G. Co. v. Chicago T. Co.* 234 Ill. 535, 85 N. E. 200, and an assertion made that they are distinguishable from this. I cannot appreciate that. If distinguishable at all, it is in favor of the judgment below. It seems to me payment was made, to all intents and purposes. How can the court legitimately say respondent's application of payments received on the account in general, shall be changed? No legal principle requires it. Equity does not demand it. The eighty-cent rate was inseparable, as respondent supposed, to appellant's knowledge. Bills were rendered,—at monthly intervals as the work proceeded,—all at the supposed rate. Appellant paid, generally, and in the aggregate, some seventy-five per cent. of the total. It made no application or communication to lead respondent to suppose there was any difficulty impending. Some of the communications seem to have been intended to direct a general application. All payments were so applied, discharging the indebtedness to respondent in the order of its having been incurred, thus covering the greater part of the matters which, according to the judgment, are now to be gone over again. The learned trial court thus found the facts, or they so clearly appear by the evidence, satisfying fully, it seems, the rule applied in the Illinois and other cases.

Now in such a transaction as this, one involving, at the best, only a technical violation of a mere legislative public utility rate, and that discovered by ultimate construction, the whole

contract, including the public utility element, fully executed on the part of respondent and largely and in general executed by appellant, before notice of any insistent objection on the part of appellant; should the court not only apply the rule in question, but so arbitrarily as to change the application of voluntary payments made as to save, or rather create or revive, a cause of action in favor of appellant to avoid its agreement? It does not seem so, but rather a bad, an inequitable and unnecessary, application of a rule which is very beneficial in its proper place, an application out of harmony with any precedent I am able to find and with the principle upon which the rule is founded.

In my judgment the findings of fact made by the trial court are supported by the evidence. The law was properly applied thereto and the judgment should be affirmed.

BARNES, J. I concur in the foregoing dissenting opinion.

A motion for a rehearing was denied January 9, 1912.