KUHL MOTOR COMPANY, Appellant, vs. FORD MOTOR COMPANY, Respondent.*

*June 3—June 28, 1955.*
*October 14—November 8, 1955.*

* Motion for rehearing granted.

For the appellant there was a brief and oral argument by *A. W. Schutz* of Milwaukee.

For the respondent there was a brief by *Shaw, Muskat & Paulsen* and oral argument by *John G. Quale,* all of Milwaukee.

MARTIN, J. The following facts are disclosed by the complaint. Plaintiff is a corporation located in the city of Milwaukee engaged in the business of selling and servicing motor vehicles. Defendant is a manufacturer of motor

vehicles, parts, and accessories. On December 12, 1938, plaintiff and defendant entered into a written "Ford Sales Agreement," which provided that it could be terminated at any time at the will of either party by sixty days' written notice. On April 17, 1954, plaintiff received from the defendant a notice of its intention to terminate the agreement (Exhibit E). Plaintiff alleges:

"6. That the writing hereto attached, marked Exhibit E, has been served upon the plaintiff by the defendant, contrary to the provisions of section 218.01 (3) paragraphs 16 and 17 thereof, of the Wisconsin statutes, in that it has been done unfairly without due regard to the equities of the plaintiff and without just provocation, and if acted upon by the defendant, unless enjoined by this court, will operate to put the plaintiff out of business and confiscate its good will, all and singular to its irreparable damage; that the cancellation of this franchise granted by the defendant to the plaintiff in and by Exhibit A hereto attached as amended, is within the scope and purview of section 218.01 (8) paragraph (d) of the Wisconsin statutes, and that the plaintiff has no adequate remedy at law or by administrative action."

Defendant demurred to the complaint on the grounds (1) that it does not state facts sufficient to constitute a cause of action, and (2) that the court has no jurisdiction of the subject of the action.

It was held by the trial court, first, that, disregarding sec. 218.01, Stats., the agreement of December 12, 1938, was valid and the notice of April 17, 1954, effectively terminated said agreement, basing its opinion on *Bushwick-Decatur Motors, Inc., v. Ford Motor Co.* (2d Cir. 1940), 116 Fed. (2d) 675; *Buggs v. Ford Motor Co.* (7th Cir. 1940), 113 Fed. (2d) 618; *Biever Motor Car Co. v. Chrysler Corp.* (2d Cir. 1952), 199 Fed. (2d) 758; and *Martin v. Ford Motor Co.* (D. C. Mich. 1950), 93 Fed. Supp. 920.

In the last-named case, at page 921, it was held:

"The agreement in this case was not for a fixèd period but was terminable at any time at defendant's will upon compliance with the requirement as to notice. It is beyond the power of the judiciary to engraft conditions upon the exercise of such a contractual right.

"The court concurs with the holding in *Bushwick-Decatur Motors, Inc. v. Ford Motor Co.*, 2 Cir., 1940, 116 F. (2d) 675, as properly applying the law of Michigan with respect to the right of termination under a similar agreement, and with the holdings in *Buggs v. Ford Motor Co.*, 7 Cir., 1940, 113 F. (2d) 618. . . .

"In the instant case it is clear that Martin's dealership was to continue no longer than either he or the Ford Motor Company desired it to continue and that its right to terminate it was subject to no conditions as to good or bad faith, motive, intent, or results, except as to the requirement of advance notice if such termination was desired by the Ford Motor Company."

Sec. 218.01 (3), Stats., so far as material, provides:

"(a) A license may be denied, suspended, or revoked on the following grounds: . . .

"16. Being a manufacturer of motor vehicles, factory branch, distributor, field representative, officer, agent, or any representative whatsoever of such motor-vehicle manufacturer or factory branch, who has attempted to induce or coerce, or has induced or coerced, any automobile dealer to enter into any agreement with such manufacturer, factory branch or representative thereof, or to do any other act unfair to said dealer, by threatening to cancel any franchise existing between such manufacturer, factory branch, or representative thereof and said dealer.

"17. Being a manufacturer, factory branch, distributor, field representative, officer, agent, or any representative whatsoever of such motor-vehicle manufacturer or factory branch, who has unfairly, without due regard to the equities of said dealer and without just provocation, canceled the franchise of any motor-vehicle dealer. The nonrenewal of a franchise or selling agreement without just provocation or cause shall be deemed an evasion of this section and shall constitute an unfair cancellation."

This statute was in effect at the time the agreement herein was made.

In 1945 sec. 218.01 (8) (d), Stats., was enacted, providing:

"*Penalties.* Any person, firm, or corporation violating any of the provisions of this section shall be deemed guilty of misdemeanor and upon conviction thereof shall be punished as follows:

"(d) Any person or persons violating subsection (3) (a) 15, 16, and 17, may in addition to, or in lieu of, the general denial, suspension, or revocation penalties in said subsection, be subject to a fine of not more than $5,000 or be subject to a suspension or revocation sentence of not more than a year effective only in the territory formerly served by the unfairly canceled dealer, or by both such fine and suspension or revocation, except that in a metropolitan area serviced by several dealers handling the same motor vehicle, the suspension or revocation order shall not be applicable to the remaining dealers."

This action is not a proceeding under ch. 218, Stats., which sets forth the administrative procedure to be followed to invoke the penalties for unfair cancellation of a motor-vehicle manufacturer-dealer contract. Plaintiff seeks to enjoin termination of the contract on the ground that pars. 16 and 17 of sec. 218.01 (3) (a), Stats., define public policy and constitute a valid exercise of the police power of the state to prohibit unfair cancellations of sales agreements.

On this question the trial court held:

"The legislature of the state of Wisconsin in enacting chapter 218 undoubtedly was of the opinion that because of the economic advantages which a motor manufacturer enjoys over a dealer the latter should be protected against harsh treatment when a manufacturer exercises his right under the contract to cancel his sales contract with the dealer.

"In order to deter the manufacturer from acting harshly or without cause in canceling his contract with the dealer

the legislature sought to accomplish said purpose by visiting certain penalties upon the manufacturer if the latter cancels his contract with the dealer without cause. The legislation in question is intended to act as a deterrent against any harsh treatment of the dealer by the manufacturer.

"There is no indication in the legislation in question of any intent on the part of the legislature to change or to declare illegal or void any term of the contract in question."

In discussing the attitude of the judiciary toward the importance of the individual's right to contract, it is stated in 12 Am. Jur., Contracts, p. 670, sec. 172:

"As the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare. Rules which say that a given agreement is void as being against public policy are not to be extended arbitrarily, because 'if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be enforced by courts of justice.' The paramount public policy is that freedom to contract is not to be interfered with lightly."

Any impairment of that right must be specifically expressed or necessarily implied by the legislature in a statutory prohibition and not left to speculation. The general rule to be applied in this case is expressed in 17 C. J. S., Contracts, p. 558, sec. 202, as follows:

"It would seem that in all cases the true rule is that the question is one of legislative intent, and the courts will look to the language of the statute, the subject matter of it, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment; and if

from all these it is manifest that it was not intended to imply a prohibition or to render the prohibited act void, the courts will so hold and will construe the statute accordingly."

The intent expressed in the introductory language of sec. 218.01 (3) (a), Stats., is that of a regulatory measure. No words are used in pars. 16 and 17 requiring the conclusion that the legislature intended to prohibit unfair cancellation of sales contracts. They simply state that a manufacturer who engages in such a practice is subject to penalty under the prescribed administrative procedure. And an inference of invalidity does not necessarily follow from the fact that the statute prescribes a penalty. The statute must be judged by itself as a whole. *Estate of Peterson* (1950), 230 Minn. 478, 42 N. W. (2d) 59, 18 A. L. R. (2d) 910. Where the legislature has intended to impress certain terms upon contracts, as, for instance, the omnibus coverage clause in automobile liability insurance contracts, it has expressly so provided. But here it has used no language "prohibiting" unfair cancellations, making them "void" or directing that every sales contract shall contain provision for cancellation only "with just provocation" or "for cause." Nor are there any specific provisions insuring enforcement of such a "prohibition." Obviously, the legislature recognized that the right of a manufacturer to terminate might be exercised without just provocation and without due regard to the equities of the dealer, but it did not declare invalid a clause permitting such an act. What it did was to make such act unprofitable by imposing the penalty of suspension, revocation, or fine. As pointed out by the learned trial court, it is apparent that the legislature recognized the inequality in bargaining power between an automobile dealer and an economically powerful manufacturer such as the defendant and that it desired to furnish him some protection by deterring unfair cancellation.

But we see no declaration of public policy in the statute.

This court stated in *Huber v. Merkel* (1903), 117 Wis. 355, 366, 94 N. W. 354:

"Where laws which are supposed to be enacted in the exercise of the police power interfere with the citizens' liberty or rights of property, they can only be justified upon the ground that they in some manner secure the comfort, safety, or welfare of society. It is on this principle that drainage laws are sustained. *Donnelly v. Decker,* 58 Wis. 461, 17 N. W. 389. And conversely, if it appear from the law itself that its purpose is primarily to benefit private owners, they are condemned. *In re Theresa Drainage District,* 90 Wis. 301, 63 N. W. 288. It must appear that the interests of the public generally require the restriction, and not the interests of private individuals. *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 90 N. W. 1098."

What is the public welfare sought to be served? This is a business contract for the sale of motor vehicles, its purpose the mutual economic benefit of both dealer and manufacturer. There is nothing inuring to the benefit of the public in the representation of a manufacturer by a certain dealer nor is there anything immoral or dangerous to the public welfare in the termination of the relationship between a particular dealer and manufacturer. While there does exist in that relationship the possibility that the dealer may suffer personal economic loss if the manufacturer arbitrarily terminates it, his loss does not adversely affect the public interest. An inequality of bargaining power is present in many contractual relationships, but the law does not attempt to equalize it by impairing the basic right to contract.

Plaintiff cites a number of cases which arose out of moratorium legislation which was enacted during the depression. Such legislation, however, was designed to protect the general welfare; it inured to the benefit of all citizens during a period of national emergency.

Plaintiff relies for its cause of action on sec. 218.01, Stats., but the statute affords it no remedy. Its purpose being purely

regulatory, the only benefit any particular automobile dealer receives from its provisions is the same benefit that all other such dealers receive—its effect of deterring unfair exercise by manufacturers of their right to terminate sales agreements at will. If it desires to take advantage of its opportunity to receive that indirect benefit, it must proceed as provided by ch. 218, Stats.; but it cannot maintain an action in equity to invalidate one of the terms of a contract it voluntarily entered into by resorting for its cause of action to the penalty provisions of a regulatory measure.

*By the Court.*—Order affirmed.

GEHL, J. (*concurring*). I would affirm upon the sole ground that, in so far as the statute may be construed to authorize the relief demanded by plaintiff, it is unconstitutional and void as infringing upon the right to contract.

Although it is not expressly reserved in either, "the right of free contract is one of the inherent rights guaranteed to the citizen by our constitution as well as by the national constitution," *State ex rel. Time Ins. Co. v. Smith,* 184 Wis. 455, 470, 200 N. W. 65; *State ex rel. Ornstine v. Cary,* 126 Wis. 135, 105 N. W. 792. "The right to contract is a property right protected by both the state and federal constitutions," although the right is not stated expressly in either document, 11 Am. Jur., Constitutional Law, p. 1156, sec. 339.

True, the right to make contracts is not absolute. It is subject to certain limitations which the state may impose in the exercise of its police power.

"Under the limitations of the equal-protection clause, in order to justify the interposition of the authority of the state in enacting police regulations, it must appear that the interests of the public generally as distinguished from those of a particular class require such interference, for it is a rule

that police power cannot be invoked to protect one class of citizens against another class unless such interference is for the real protection of society in general." 11 Am. Jur., Constitutional Law, p. 1000, sec. 263.

When a restriction is made under the authority of the police power "it must appear that the interests of the public generally require the restriction, and not the interests of private individuals." *Huber v. Merkel,* 117 Wis. 355, 366, 94 N. W. 354.

". . . whether a given situation presents a legitimate field for the exercise of the police power placing restraints upon the use of property or upon personal conduct, depends upon whether the situation presents a reasonable necessity for the imposition of restraint in order to promote the *public welfare,* and whether the means adopted bear a reasonable relation to the end sought to be accomplished. It goes without saying that the legislature may not, in the exercise of its police power, pass a law expressly prohibited by the constitution. It is also accepted doctrine, we think, everywhere that laws imposing restraints interfering with the use of property or personal liberty, in the absence of some *public* necessity therefor, cannot be sustained. The cases cited emphasize the judicial duty and function to determine whether a given exertion of the police power is a reasonable exercise thereof." (Emphasis supplied.) *State ex rel. Carter v. Harper,* 182 Wis. 148, 152, 196 N. W. 451.

I am not convinced that the interests of the public require that any particular Ford agency be continued in business. I do not believe that the welfare of the public would be affected by the substitution by Ford of the "XYZ" Motor Company for the Kuhl Motor Company as its agent. I doubt that I could be convinced that the interests of the public would be affected by the cancellation of the Kuhl contract and Ford's omission to grant a substitute franchise. I doubt that it can properly be said that the public is affected solely because Ford is a large institution and Kuhl is a relatively small one. If

the relative size of the parties to the contract is to be held controlling, at what stage does a contracting party become too large to be permitted to require that it may terminate its contract upon giving a sixty-day notice, and when is the other party to be considered too small to be allowed to consent that cancellation may be so made although by the terms of the contract it is given the right to terminate without notice?

I am authorized to say that Mr. Justice BROADFOOT and Mr. Justice STEINLE join in this concurring opinion.

CURRIE, J. (*dissenting*). I must respectfully dissent from the court's opinion in this case. Sec. 218.01 (3) (a) 17, Stats., provides that an automobile manufacturer's license to transact business in Wisconsin may be denied, suspended, or revoked where such manufacturer *"has unfairly, without due regard to the equities of said dealer and without just provocation, canceled the franchise of any motor vehicle dealer."* Sec. 218.01 (8) (d) provides that in addition to, or in lieu of, the denial, suspension, or revocation of the license of an automobile manufacturer who violates par. 17 of sec. 218.01 (3) (a), such manufacturer may "be subject to a fine of not more than $5,000." The state has thus made it crystal clear that the unfair cancellation of a dealer's franchise without provocation and without considering the dealer's equities is against the public policy of this state.

In *Menominee River B. Co. v. Augustus Spies L. & C. Co.* (1912), 147 Wis. 559, 571, 132 N. W. 1118, in an opinion by Mr. Justice TIMLIN, the court stated:

"A contract made in violation of a statute or for performance of an act which is prohibited by statute is void and will not be enforced by the court. This is true whether there is a prohibition and a penalty or merely a prohibition."

The above quotation was quoted with approval in *Guardian Agency v. Guardian Mut. Savings Bank* (1938), 227 Wis. 550, 559, 279 N. W. 79, 115 A. L. R. 1356. The latest pronouncement of our court on this subject was made in *Pedrick v. First Nat. Bank of Ripon* (1954), 267 Wis. 436, 439, 66 N. W. (2d) 154, wherein it was declared:

" 'An agreement is against public policy if it . . . violates some public statute, . . .' 12 Am. Jur., Contracts, p. 663, sec. 167. '. . . courts of justice will not recognize or uphold any transaction which, in its object, operation, or tendency, is calculated to be prejudicial to the public welfare, to sound morality, or to civic honesty. *The test is whether the parties have stipulated for something inhibited by the law* or inimical to, or inconsistent with, the public welfare.' Id., pp. 662, 663. (Italics ours.) Unquestionably, according to the complaint the parties here stipulated for something inhibited by the law, namely, the appointment by a corporate executor of the attorney for the estate. Agreements against public policy or prohibited by public law '. . . cannot be enforced by one party against the other, either directly by asking the court to carry them into effect or indirectly by claiming damages or compensation for breach of them.' 12 Am. Jur., Contracts, p. 715, sec. 209."

The majority opinion states that secs. 218.01 (3) (a) 17, and 218.01 (8) (d), Stats., do not expressly prohibit unfair cancellation of dealers' contracts by auto manufacturers, but only subject manufacturers who engage in such practice to a penalty for so doing. The same argument might be advanced against many of the criminal statutes of this state, which do not in express words prohibit people from doing certain acts but only state that if they do perform such acts a penalty will be inflicted. Sec. 346.06 (1) [1] relating to bribery of officers

---

[1] Sec. 346.06 (1). Any person who shall corruptly give, offer, or promise to any executive, judicial, legislative, administrative, or other officer of the state, or of any county, town, city, village, school district, or of other municipal corporation or subdivision

is an example of such type of criminal statute. However, it is doubtful if anyone would have the temerity to seriously contend that a contract to bribe an officer would not be illegal and against public policy.

Par. 17 of sec. 218.01 (3) (a), Stats., was enacted in 1937, and the dealer's contract entered into between the defendant and the plaintiff corporation was executed on December 12, 1938. Any dealer's franchise contract entered into between an automobile manufacturer and a Wisconsin dealer applicable to business to be transacted in Wisconsin would be subject to the provisions of such statute, and any provision of such contract which violated the statute would be against public policy and void under the authorities above cited. If the provision of the agreement permitting the Ford Motor Company to terminate the franchise upon sixty days' advance notice is to be interpreted as authorizing the Ford Motor Company to unfairly cancel the same without just provocation, then such provision would be void. On the other hand, if such termination provision of the contract can be interpreted in the light of the statute as being operative upon giving the sixty-day notice so as to permit a cancellation upon

therein, after his election or appointment, and either before or after he shall have been qualified or shall have taken his seat, any gift or gratuity, or any money, goods, thing in action, personal or real property, or any thing of value, or any pecuniary or other personal advantage, present or prospective, with intent to influence his vote, opinion, judgment, or action upon any question, matter, cause, or proceeding which may then be pending or which may by law come or be brought before him in his official capacity, and any such officer who shall corruptly accept or receive any such gift, gratuity, money, goods, thing in action, personal or real property, or any thing of value, or any such pecuniary or other personal advantage, present or prospective, under any agreement or understanding that his vote, opinion, judgment, or action should be thereby so influenced shall be punished by imprisonment in the state prison not more than five years nor less than one year, or by fine not exceeding one thousand dollars nor less than two hundred dollars.

any ground except one which contravened the statute, then such cancellation clause would not be void *in toto*. It is this latter interpretation which the law favors and which I believe should be adopted by this court.

The majority opinion in effect holds that if the statute were to be construed as prohibiting automobile manufacturers from entering into franchise contracts with Wisconsin dealers, which would restrict the right of the manufacturer to cancel the same, the statute would be unconstitutional as violating the Fourteenth amendment. The reason advanced for such conclusion is that interference with the right to contract can only be grounded upon the exercise by the state of its police power to promote the general welfare, and the statute was not enacted in the interest of the general public but only to benefit a particular small class of citizens, viz., auto dealers.

The United States supreme court, as early as 1887, in *Mugler v. Kansas* (1887), 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, expressly laid down the overriding doctrine that neither the defense of impairment of existing contracts nor the taking of property without just compensation is a defense to the acts of the state when done under the authority of its police power if that power is otherwise validly exercised.

In discussing the extent of the police power the United States supreme court in *Berman v. Parker* (1954), 348 U. S. 26, 32, 75 Sup. Ct. 98, 99 L. Ed. 27, declared:

"Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. *Yet they merely illustrate the scope of the power and do not delimit it.*" (Emphasis supplied.)

One of the latest pronouncements of the United States supreme court toward the exercise of police power by the states is to be found in *Williamson v. Lee Optical Co.* (1955),

348 U. S. 483, 488, 75 Sup. Ct. 461, 464, 99 L. Ed. 563, wherein it was stated:

"The day is gone when this court uses the due-process clause of the Fourteenth amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. [Citing cases.] We emphasize again what Chief Justice WAITE said in *Munn v. Illinois,* 94 U. S. 113, 134 [24 L. Ed. 77], 'For protection against abuses by legislatures the people must resort to the polls, not to the courts.' "

It would seem reasonably clear that one of the chief objectives of the legislature in enacting sec. 218.01, Stats., in so far as it seeks to regulate the dealings between automobile manufacturers and dealers, is to promote fair dealing, which, of course, is a legitimate exercise of police power. *Petition of State ex rel. Attorney General* (1936), 220 Wis. 25, 264 N. W. 633. In stating the underlying reason for such conclusion it would be difficult to improve upon the forceful language of Mr. Chief Justice HUGHES in his dissent in *Moorehead v. New York ex rel. Tipaldo* (1936), 298 U. S. 587, 627, 56 Sup. Ct. 918, 80 L. Ed. 1347, 103 A. L. R 1445:

"We have had frequent occasion to consider the limitations of liberty of contract. While it is highly important to preserve that liberty from arbitrary and capricious interference, it is also necessary to prevent its abuse, as otherwise it could be used to override all public interests and thus in the end destroy the very freedom of opportunity which it is designed to safeguard."

The fact that the persons to be benefited by this regulatory measure are confined to one class of our citizens, auto dealers, does not militate against the same being a legitimate exercise of the police power. As the Connecticut court recently stated

in *Amsel v. Brooks* (1954), 141 Conn. 288, 297, 106 Atl. (2d) 152, 157, 45 A. L. R. (2d) 1234, 1241:

"A statute which is otherwise within the police power or serves a public purpose is not unconstitutional merely because it incidentally benefits a limited number of persons."

While all the citizens of the state are entitled to be protected against unfair dealing by others, this does not mean that the legislature must by one sweep prohibit all unfair dealing and cannot proceed piecemeal to remedy particular types of unfair dealing which manifest themselves in particular occupations or industries. On this point it is only necessary to quote further from *Williamson v. Lee Optical Co., supra* (348 U. S. 488):

"Secondly, the district court held that it violated the equal-protection clause of the Fourteenth amendment to subject opticians to this regulatory system and to exempt, as sec. 3 of the act does, all sellers of ready-to-wear glasses. The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. *Tigner v. Texas,* 310 U. S. 141 [60 Sup. Ct. 879, 84 L. Ed. 1124]. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. *Semler v. Dental Examiners,* 294 U. S. 608 [55 Sup. Ct. 570, 79 L. Ed. 1086]. The legislature may select one phase of one field and apply a remedy there, neglecting the others. *A. F. of L. v. American Sash Co.* 335 U. S. 538 [69 Sup. Ct. 258, 93 L. Ed. 222]. The prohibition of the equal-protection clause goes no further than the invidious discrimination."

A convincing argument in favor of the legislature exercising the state's police power to protect automobile dealers against unfair dealing on the part of automobile manufac-

turers is provided in the following statement by Mr. Justice BLACK in his dissenting opinion in *Ford Motor Co. v. United States* (1948), 335 U. S. 303, 323, 69 Sup. Ct. 93, 93 L. Ed. 24:

"At the time the decrees were entered, Ford made and sold about 25 per cent of all cars in the United States, Chrysler 25 per cent and General Motors 44 per cent. Ford and the others sell to dealers about four billion dollars' worth of cars yearly, requiring cash on delivery. The dealers then sell to retail customers. About 60 per cent of the retail sales are on credit. Dealers not permitted to sell other makes of cars are wholly dependent upon Ford's, G. M.'s, or Chrysler's favorable treatment for their business lives. The dealer agencies are for one year, but the agency contracts can be canceled on short notice and without cause. The dealers are thus economic dependents of the company whose cars they sell."

The instant appeal reaches us on the pleadings. I would reverse with directions to overrule the demurrer so that a trial might be had on the issue of fact of whether the reasons underlying the Ford Motor Company's attempt to cancel the plaintiff's franchise were unfair, without due regard to plaintiff's equities, and without just provocation.

I am authorized to state that Mr. Chief Justice FAIRCHILD and Mr. Justice BROWN join in this dissent.

A motion for rehearing was granted on September 16, 1955, and oral argument was heard October 14, 1955.

For the appellant there was a brief and oral argument by *A. W. Schutz* of Milwaukee.

For the respondent there was a brief by *Shaw, Muskat & Paulsen,* and oral argument by *John G. Quale,* all of Milwaukee.

A brief was filed by *Rieselbach & Nelson* of Milwaukee, as *amicus curiae.*

The following opinion was filed November 8, 1955:

PER CURIAM (*on reargument*). Mr. Justice BROADFOOT announces that he withdraws his concurrence in the concurring opinion and that he now joins in the prior dissenting opinion. By reason of this, such prior dissenting opinion now becomes the majority opinion in this case. Mr. Justice MARTIN, Mr. Justice GEHL, and Mr. Justice STEINLE dissent therefrom for the reasons already stated in the original majority and concurring opinions.

The previous mandate is vacated. The order appealed from is reversed, and cause remanded with directions to overrule the demurrer.