J. W. WELLS LUMBER CO. *v.* MENOMINEE RIVER
BOOM CO.

INJUNCTION — COMITY OF STATES — LOGS AND LOGGING — BOOMAGE
CHARGES—EQUITY.

Defendant, a boom company incorporated in both Michigan
and Wisconsin, operating on the Menominee river, sued
plaintiff, a Michigan corporation, in the Wisconsin courts,
to recover boomage and rafting charges upon logs de-
livered during the seasons of 1908 to 1913, inclusive.
Plaintiff answered, setting up alleged excessive charges
under the Wisconsin statute upon logs delivered during
1904-1907, by way of counterclaim, to which defendant
pleaded the statute of limitations. While said suit was
pending plaintiff filed its bill to enjoin defendant from
further prosecuting its action in the Wisconsin suit, al-
leging that its counterclaim is barred in Wisconsin but
is not barred in Michigan. *Held,* that plaintiff had failed
to show excessive charges for booming and rafting when
proper allowance was made for sorting its logs and other
legal charges, and that there were no such compelling
equities requiring the court to break over the rule of
comity and policy which forbids the granting of an in-
junction to stay proceedings in a suit already begun in
a court of competent jurisdiction of a sister State.

Appeal from Menominee; Flannigan, J. Submitted
April 24, 1918. (Docket No. 111.) Decided Septem-
ber 27, 1918.

Bill by the J. W. Wells Lumber Company against
the Menominee River Boom Company to enjoin an ac-
tion at law, and for an accounting. From a decree
dismissing the bill, plaintiff appeals. Affirmed.

*Sawyer & Sawyer* (*Martineau & Martineau,* of coun-
sel), for plaintiff.

*Fred H. Haggerson* (*Upham, Black, Russell & Rich-
ardson,* of counsel), for defendant.

MOORE, J. This is an appeal by plaintiff from a decree of the circuit court for Menominee county, dismissing the plaintiff's bill of complaint in a suit to permanently enjoin the defendant from further prosecuting an action begun by it against plaintiff pending in the circuit court for Marinette county, Wisconsin, and for an accounting. The instant case was heard on its merits before Richard C. Flannigan, circuit judge, who filed a written opinion which reads as follows:

"For the purpose of improving the Menominee river and its tributaries, and the driving, sorting, holding and delivery of logs and timber thereon, the Menominee River Boom Company, a Michigan corporation, was organized November 8, 1887, under the provisions of Act No. 91 of the Public Acts of Michigan of 1887. On the same day, and for the same purposes, the Menominee River Boom Company, a Wisconsin corporation, was organized under the provisions of chapter 86 of the Revised Statutes of that State and the acts amendatory thereof. On December 27, 1887, the defendant was organized by consolidation of the Michigan and Wisconsin corporations mentioned, agreeable to the provisions of the Michigan and Wisconsin statutes referred to.

"The defendant has been engaged in the driving, sorting and delivery of logs on the Menominee river continuously since the consolidation. Its principal office was located by its articles at Marinette, Wisconsin, where it has since remained. With the exception of a director, who resided at Menominee, all of its officers and directors reside at Marinette, Wisconsin.

"The defendant succeeded, presumably by purchase, to the river rights and property of the Menominee Manufacturing Company, which theretofore conducted boomage operations on the river.

"The complainant is a Michigan corporation organized for the manufacture of lumber. Its saw-mill is situated on the shore of Green Bay within the limits of the city of Menominee, at which place its principal office is located. The mill of the complainant has

been in operation for a long period of years. Practically all the pine logs sawed at its mill and all the cedar and other floatable timber cut by it in the woods came down the Menominee river and through the boomage ground of the defendant. The acquaintance of its officers with the manner in which the boomage operations have been conducted on the river has been long and familiar. Mr. J. W. Wells, its president, testified to his connection with lumbering operations on the river and familiarity with the booming operations thereon since 1869.

"The boomage grounds of the defendant extend from near the mouth of the river upstream in the neighborhood of a mile. Saw-mills were located at different points on both banks of the river within the limits of the boomage ground, and various other mills, including the complainant's, which received their log supply from the river, were located on the shore of Green Bay.

"When the logs of the various owners, intermingled, reached the head of the boomage ground, it was the practice of the defendant, which is not criticized, to stop them at the mill first encountered, and from the mass separate and deliver into a floating pocket the logs belonging to that mill. As the pockets of the other mills were reached in succession, the same process was repeated, until all logs belonging to the river mills were separated from the mass and delivered. The logs belonging to the shore mills were continued on down to what is called the rafting gap, where they were separated. Afloat on the river below the rafting gap were various pockets, called rafting pockets, into one of which the logs going to a particular shore mill would be run. From these so-called rafting pockets the logs were then taken by the defendant and delivered to each shore mill proprietor, made up in rafts of a size, and so built and secured as to insure their convenient and safe transportation by means of a tug out of the river and over the bay to the mills to which they respectively belonged.

"Previous to 1890, a uniform price, called a 'boomage charge' was made against all logs going through the booming ground, irrespective of the mill to which they were delivered. In that year the uniform rate

was abandoned and a rate was made for each point of delivery. The new rate, which was lowest against the logs first separated and delivered, increased as deliveries were made lower down, until the rafting gap shore mill delivery point was reached, where the price was highest.

"It was the practice of the defendant, in keeping its accounts of the expense attending the separation and delivery of the logs, to pro rate the cost of the delivery of the logs of each proprietor upon all logs in the mass from which they were taken. The removal of the logs of the first proprietor did not, it would seem, materially lessen the expense of separation at the next lower gap, and such expense being pro rated on a less number of logs, it followed necessarily that the charges for the second separation increased, which increase was augmented as the number of logs in the mass was reduced by each successive separation.

"The rates charged by the defendant for delivery of the logs at the various gaps did not necessarily, and were not supposed to, represent the actual cost of the delivery ascertained in the manner mentioned, but were fixed rates for the years in which they were made, which might prove to be more or less than the actual cost of handling the logs in that year. But in arriving at the rates for a given year, the cost of handling the logs at each delivery gap during the preceding years was largely a controlling factor and was taken into account, together with the labor conditions, the estimated number of logs to come down and all other matters bearing on the cost of handling the logs. The practice of discriminating between the different delivery gaps in making up the boomage charges, and its method of arriving at the rate for each gap, was continued by the defendant from 1890 until the decision by the Wisconsin supreme court of *Menominee River Boom Co.* v. *Spies Lumber & Cedar Co.*, October 24, 1911, 147 Wis. 559 (132 N. W. 1118), and without disclosed objection on the part of the complainant or other mill proprietor, until the spring of 1908.

"Notification of the rates for each year was communicated to the log owners by a circular letter signed by the secretary of the defendant. The circular letter

sent out in each of the years to which this controversy relates was the same except as to the rates charged, which differed in different years. Respecting the complainant's logs, the letter proposed, for the charge specified, to separate them from the logs of the other owners and deliver them to the complainant, or its authorized agent, 'at the rafting gaps, made up in ordinary sized rafts.' On the back of the secretary's letter was a printed letter addressed to the defendant, requesting and authorizing it to drive, boom and handle all the logs therein referred to, concurrently with the logs of other owners, upon the terms and stipulations set forth in the secretary's letter, and to deliver the same as the log owner had already directed or might thereafter direct. In blank spaces which were provided the owner was requested to fill in the number of logs banked by him on the Menominee and its tributaries, and then to sign, swear to and forward the letter to the defendant.

"The complainant received from the defendant the usual circular letter specifying the rates to be charged for delivery of its logs in rafts in 1904, 1905, 1906 and 1907, whereupon the number of logs banked by it for floatage to Menominee was filled in, and the printed letter requesting the defendant to sort and deliver them 'on the terms and stipulations' set forth in the defendant's letter, was signed, sworn to and forwarded to the defendant by an authorized officer of the complainant.

"The rate charged for the delivery of the 1904 logs was 58 cents; for the 1905 logs, 68 cents; for the 1906 logs, 80 cents, and for the 1907 logs, 76 cents. The logs which came down in each of those years were sorted and delivered in the manner described, and the rates charged therefor not only were paid by the complainant without protest or objection of any sort, but it took advantage of a 2 per cent discount proposition which the defendant offered its patrons as an inducement to quick settlements.

"The logs owned by the complainant were pine and cedar. The number of each was not given accurately by any witness, but as compared to the pine the number of cedar logs was small. In each of the years mentioned the complainant requested the defendant to

separate its cedar from its pine logs and deliver them separately. With this request the defendant complied. For making the extra separation which compliance with such request entailed no extra charge was made. The right of the complainant to such extra work without extra charge seems to have been considered as covered by the stipulation of the letter mentioned, that delivery was to be made as directed by the complainant.

"In the spring of 1908 the complainant and the Spies Lumber Company, another shore mill proprietor whose logs were delivered as were the complainant's, objected to the rate which was fixed for that year at 80 cents. A large quantity of logs were handled through the rafting gaps that year for the Spies Lumber Company, for which it made payment of the defendant's charges in part, but refused payment of the remainder. To recover the remainder of its charges the defendant brought its suit in Wisconsin, which, as has been related, was finally decided by the supreme court of that State. (*Menominee River Boom Co.* v. *Spies Lumber & Cedar Co., supra.*)

"Briefly stated, the Wisconsin court held the charge for sorting and delivery was limited by the Wisconsin statute to fifty cents per thousand feet; that the charge, whether fifty cents or under, must be uniform, and that uniformity required that the charge be the same against all logs handled in the boomage ground, whether delivered at the first or last gap, or at any gap between.

"The Wisconsin court held further, and correctly, that the obligation placed on the defendant by the statutes of both States, to sort and deliver, for a reasonable and uniform rate, does not require the defendant to raft the logs for transportation on Green Bay, and does not require it to sort a particular kind of logs from the other logs of an owner; and in addition to the fifty-cent rate for sorting and delivering the defendant was entitled to charge a reasonable amount for making the logs up into rafts, and unless it appeared it did the same thing for the other owners without extra charge, it would be entitled to a further additional charge for separating the cedar from the other logs of the same owner.

"The defendant does not claim it is entitled to charge for its services in sorting and delivering the complainant's logs, during any of the years in dispute, more than fifty cents per thousand feet, and therefore this case does not present the question whether, where it appeared the actual cost of sorting and delivery exceeded fifty cents, the defendant, in a Michigan court, would be entitled under the Michigan law (Act No. 91, Pub. Acts 1887), which requires only that the charge be reasonable and uniform, without other limitation, to exact at least the actual cost of the work, notwithstanding the Wisconsin limitation of fifty cents.

"The complainant conceded a boomage charge of fifty cents a thousand upon all of its logs delivered in 1904-7 was earned, and was reasonable and lawful, and also that the defendant is entitled to charge in addition for rafting and for any extra sorting not done for the other owners.

"The controversy between the parties is, it will be seen, narrow, and presents practically the single question whether the amounts received by the defendant in those years beyond fifty cents was a reasonable charge for rafting.

"April 17, 1914, the defendant commenced a suit in the circuit court of Milwaukee county, Wisconsin, against the complainant, to recover boomage and rafting charges upon logs delivered during the driving seasons of 1908 to 1913, inclusive. The suit was commenced by attachment which was levied on certain lands owned by the complainant in Wisconsin. The complainant appeared in that suit and answered, setting up the alleged excessive charges upon the logs delivered in 1904-1907, by way of offset, or, as it is called in Wisconsin, counterclaim, against the demand of the defendant. In bar of the counterclaim the defendant pleaded, among other matters, the statute of limitation. The cause being at issue, it was, by stipulation of counsel, for the convenience of witnesses and parties, transferred from the circuit court of Milwaukee county to the circuit court of Marinette county, which is a court of original, general, common law and equity jurisdiction. After the case against the complainant reached the Marinette circuit court, where it

is now pending, and on October 23, 1914, the bill of complaint by which this suit was commenced was filed.

"The bill of complaint sets up the commencement and pending of the Wisconsin suit; the complainant's claim for excess charges in 1904-5-6-7, and that it is barred in Wisconsin and is not barred in Michigan by lapse of time from offsetting the amount of such alleged excess against the claim of the defendant. The bill prays for an injunction restraining the defendant from further prosecution of the Wisconsin suit and for an accounting of the amount due the defendant for delivery of logs in the year 1908 to 1913, inclusive, and of the amount of the alleged excess charges upon the logs delivered in 1904 to 1907, inclusive, and that the amount of such excess be offset against the defendant's claim.

"Upon the filing of the bill an order was made requiring the defendant to show cause why a temporary injunction should not issue restraining it as prayed. In opposing the issue of a temporary injunction the defendant insisted, the alleged excessive charges being assumed, the court was without jurisdiction to restrain the prosecution of a suit already commenced and pending in a court of another State. With leave to the defendant to save it by answer and present it again at the hearing, the point was overruled and the temporary injunction issued. Thereupon the defendant answered and the case was heard at due course on proofs taken partly before a commissioner and partly in open court.

"To entitle the complainant to any consideration, it must first show, of course, that the charges alleged by it to have been excessive were so in fact. Further than the testimony of the president of the company, Mr. J. W. Wells, and of Loe Bolanger and Mitchell Collette, no evidence was offered touching the cost of rafting, excepting certain figures taken from the books of the company, which will be noticed later.

"Mr. Wells testified that for three or four years previous to 1880 he rafted his own logs. 'For a year or so,' he said, all the logs sent down to the rafting gaps were owned by him, 'so that there was no sorting.'

" 'Then Ramsey & Jones (also shore mill proprietors) came on the river. Their logs were sorted by the boom company to

the same pocket with ours, and we took the logs they ran into this pocket and rafted them up and handled them in that way.'

"The rafting was done by Mr. Wells at about the same place, with substantially the same facilities and under practically the same conditions as in 1904-7. It was necessary to separate from his own logs such of the Ramsey & Jones logs as were run into the common pocket, in order to raft his and theirs separately. Whether the amount of the Ramsey & Jones logs was large or small no attempt was made to show.

"In reply to the question, 'What was the total cost of rafting, including sorting?' Mr. Wells answered from 9½ to 11 cents. He was not asked to and did not give the cost of rafting alone, but it is evident he intended the lesser figure, 9½ cents, as the cost of rafting during the 'year or so' he rafted his own logs only, and when there was no sorting. Finding the rafting cost, when conducted by Mr. Wells in 1877-9, to be 9½ cents per thousand feet, does not, unfortunately, aid the court in arriving at the rafting cost in 1904-7. Mr. Wells said, and every one having the slightest familiarity with the floating of saw-logs knows it to be a fact, that the cost of rafting large logs, or a large number of logs, is less than the cost of rafting smaller logs or a smaller number of logs.

"From a record of the run of the river, which was introduced, it appeared that in the first year's operations, which was 1868, 62,809,804 feet came down. Thereafter the amount gradually increased from year to year until the maximum of 642,137,318 feet was reached in 1889. From that year forward there was a gradual decrease, until the low mark of 24,231,208 feet was reached in 1913. The record for 1914 or 1915 was not introduced, but that the decline has continued may be gathered from the common report that the drive going down as this is written will be the last, or the last but one, of the river.

"The run of the river when Mr. Wells was rafting was 137 million in 1877; the same in 1878, and 181 million in 1879, against 124 million in 1904, 91 million in 1905, 88 million in 1906, and 82 million in 1907. The fact that the run of the river was greater in 1877-9 than in 1904-7 does not necessarily mean that the number of logs in the Wells raft was greater in

the former than in the latter years. Whether Mr.
Wells intended to be understood as saying the number
of logs in the rafts of 1877-9 was the same or less
than the number of the rafts of 1904-7, is not clear
when his direct and cross-examination are compared,
but he frankly admitted the run of the logs was mate-
rially larger in 1877-9 than in 1904-7.

"A record of the number and size of the logs that
passed through the booming ground previous to 1878
was not kept, but was kept in 1878 and all subsequent
years. According to the record kept from 1878 for-
ward, the size of the logs dropped from an average
of 161 feet in 1878, when Mr. Wells was rafting, to
an average of 47 feet in 1907. The logs handled by
Mr. Wells during the three years he was rafting aver-
aged about six to the thousand, while the logs rafted
in 1904-7 averaged about 20 to the thousand.

"Resulting from his 40 odd years' experience in
river operations, Mr. Wells was able to say the hand-
ling of a large log is no more difficult than the hand-
ling of a small log and that the expense of handling
increases as the size of the log diminishes.

"If it cost 9½ cents to raft six logs in 1887-9, what
shall we say it cost to raft 20 logs in 1904-7, at the
same place, with the same facilities and under the
same conditions, except as to labor cost, which was
higher? Figuring at the rate established by Mr. Wells,
it would cost over 31 cents to raft 20 logs or 1,000
feet of timber.

"Joseph Bolanger, who was the defendant's fore-
man at the rafting gap since 1882, said seven or eight
men could make up a raft of from 75,000 to 100,000
feet of logs in two hours. Mitchell Collette, who had
no experience in making up rafts, but saw them made
during his seven years' service on the river, gave it
as his opinion that seven or eight men could make up
a raft of about 75,000 feet in one hour. By spreading
the labor cost of eight men for two hours against the
number of feet of logs in the raft, complainant's coun-
sel finds the average cost of rafting logs to be from
3 to 5 cents per thousand feet. There would be force
in the testimony of these witnesses was it not that
the other testimony in the case shows their conclusions
to be ill-considered and unreliable. The complainant

will not expect the court to disbelieve the testimony of Mr. Wells, and that the court would have to do to give the opinions of Bolanger and Collette the construction and effect claimed for them by counsel. If their estimate is taken, it would put the rafting cost in 1904-7, when the logs were smaller and labor cost higher, much less than Mr. Wells said he found it, and many times less than the actual figures on the defendant's books show it to have been. Both these witnesses said that adverse winds made rafting more difficult and expensive and that the time for completing a raft, which they specified, contemplated ideal weather conditions.

"These rafts were not haphazard affairs. They had to be built on certain lines. They might be as long as the capacity of the tug admitted, but they must not be above a certain width to let them through between the piers of the drawbridge in their course out of the river. To that end it was not admissible to run the logs from the pocket into the raft booms hit or miss, but with deliberation and care, to see that each log was, as it is termed, 'ended up,' so as to keep the raft to the necessary width. When the raft was formed in that way ropes and chains were fastened across the booms to keep it in proper shape and intact while in transit.

"The record is silent on the subject, but it may perhaps be assumed as an incident of the business, that more or less time of the men was lost in waiting for the logs to come down, or through the failure of the owner to promptly remove a completed raft out of the way of constructing another. Counsel did not take those matters into his calculation, nor did he take into account the loss of a pike pole here and of a cant hook there, of a rope from one raft and a chain from another, or any other of the innumerable little but frequent happenings which, at the end of the season, foot up to a large figure to be added to the cost of rafting logs. In other words, counsel overlooked the fact that there are expenses incident to the rafting of logs besides the labor cost measured by the hours of men who were actually engaged in making up the rafts.

"It appears that since the defendant has been oper-

ating the booms it has kept a detailed account of the number, average size and scale of all logs that went through the booms, and of the actual cost of separating and delivering them into the various mills and rafting pockets, and also of the cost of rafting such of the logs as were delivered in that way. For the information of the directors, when the fixing of boomage rates was under consideration, these accounts were drawn off the books, classified, compiled and charted, so that the cost and net results of the operations for the year covered by the chart could be seen at a glance.

"The charts so made up for 1904, 1905 and 1907 were offered in evidence by the complainant, generally so far as the record discloses, and may be resorted to for such help as they offered in arriving at the cost of rafting in those years. Their accuracy or the accuracy of the books from which they were taken is not challenged.

"They show the actual rafting cost (not including rent of pockets or booms) for 1904 to have been .1686, for 1905, .1793, for 1907 (found by approximation for which the sheet furnishes a basis), .2029 per thousand feet. The chart for 1906 was not at hand, and unfortunately for exact figuring, both sides neglected to go to the books for the rafting cost of that year. There is no testimony on the subject to which attention has been called, except that of the witness Burke, at present secretary of the defendant, but who was its bookkeeper in 1906 and subsequent years. In reply to an inquiry by complainant's counsel, he placed the rafting charge for that year at 25 cents. The answer may, but does not appear to have been based on an examination of the books for that year. By comparison of figures found in the exhibits, defendant's counsel finds the 1906 cost to be .2409, but the exhibits do not, nor does the record of the case as a whole, furnish a certain basis for the result found by him. While the run of the river does not serve to fix with certainty, or even approximately, the amount of logs rafted in a given year, it may not, perhaps, be extravagant to presume, the run of the river being over three million feet less in 1906 than in 1905, that the logs rafted in 1906 did not exceed the amount rafted in 1905. This presumption is materially aided

by the fact that in 1906 there were rafted for the complainant alone 7,376,999 feet, against 4,928,598 feet in 1905. It appears the cost gradually increased from year to year. The charts show an increase in 1905 above 1904 of .0107, and an increase in 1907 above the cost in 1905 of .0236, and perhaps, also, it is not unreasonable to indulge the further presumption that the actual cost in 1906 at least equaled the cost in 1905. On the basis of these figures the defendant collected from the complainant in 1904 and 1905 less, and in 1906 and 1907 more, than the actual cost of rafting, not including rent of facilities. The amount paid above the cost in 1906 would be $742.86, and in 1907, $147.94, or a total for the two years of $917.70.

"The charts show a pocket rent charge which, when multiplied by the quantity of logs rafted for the complainant in 1904, 1905 and 1907, amounted to $749.51. This rent was applied only against logs rafted, and evidently was for the use of the rafting pockets, since the rafted logs were not pocketed except below the rafting gap.

"It was the privilege of the defendant to deliver the logs afloat and it was the duty of the log owner to provide a pocket or other contrivance for their reception at the point of delivery. The shore mill proprietors did not provide such pockets. For their use the defendant constructed various pockets and kept them in good repair and safe condition. It did not charge the log owner rent for such pockets in addition to the fixed rate for sorting and delivery in rafts, but the use and wear and tear thereof was taken into account as an item of expense in making the rate, and, under the designation 'pocket rent,' it will be found listed against all logs rafted, in addition to all other items of expense.

"When the logs were run through the rafting gap and into the pocket set apart to their owner, the services of the defendant, covered by the terms, 'holding, sorting and delivering' terminated. Any 'holding' of the logs above the rafting gap—the point of delivery by means of booms or otherwise, would be compensated for by the legal rate for 'holding, sorting and delivery.' But that rate would not compensate for,

and was not intended to cover, the rental value of a pocket set apart by the defendant, for the exclusive use and convenience of a log owner, in the holding of his logs, until at his leisure, he saw fit to provide a tug to take them away. The holding which the law contemplates as covered by the fifty cent rate, is only such holding as is ordinarily, incident to the sorting and delivery of logs. It is always necessary to hold the logs to make a delivery, and it is commonly necessary to hold them on account of water conditions, and possibly for other reasons. For any other holding or sorting the defendant is entitled to be compensated. Otherwise an owner might allow his logs to remain in the booms an entire season. No such unjust result was intended by the legislature of either State.

"If it was concluded that storing in the rafting pocket was an incident of booming and not of rafting nevertheless the complainant should not escape accounting for the rent. It saw fit to sweep aside the written contract covering all these matters, and invoke the law which declares for a reasonable and uniform rate. Having invoked the principle of uniformity it must expect to have it applied against it as well as in its favor.

"Uniformity is not accomplished by making the same rate for the same service, to all log owners. It requires also that no valuable service be rendered to one log owner without charge, that is not rendered to all log owners without charge. To compel one log owner to construct and maintain a reception pocket, at his own expense, and give the same facilities free to another owner, would be discrimination. Such free use of the pocket would amount to a rebate of a portion of the boomage charges, and what amounted, directly or indirectly, to a 'rebate of any portion of such charges, the defendant has no right to give or the complainant to receive. That the collection of the pocket rent, if classed as an incident of booming might increase the boomage rate beyond the legal limit, would be no objection. The complainant had a right to allow matters to remain as they were or invoke the rule of uniformity. Having invoked the law he will not be allowed to claim its benefits and disregard its obligations. Whether the rent is properly considered

a boomage charge or not, the defendant as against the complainant, is entitled to credit for it. If it is found to increase the boomage rate beyond the legal limit, it will become a matter of adjustment between the defendant and all the log owners. Any boomage charges collected by the defendant above the legal rate belongs to the log owners and should be pro-rated among them.

"Crediting the defendant with the pocket rent will serve to reduce the apparent excess rafting cost paid by the complainant, to $168.19. But the defendant is also entitled to credit for the use of its towing booms employed in conveying the logs from the river to the mills. That use was stipulated for in the written contract ten cents per hour per set, to be charged for from the time they were put in use until returned to the rafting gap empty. The 1904-7 accounts paid by the complainant do not include a charge for the towing booms. The record does not show, exactly or approximately, the number of hours the towing booms were employed but, when it is considered that over 21,000,000 feet of logs were transported in the booms; the leisurely way on which log rafts necessarily proceed, the delays resulting from adverse winds and other difficulties naturally associated with the business of towing and it will be appreciated that the booms must have been in service a considerable time, and that the use of them at the ten cent rate, or even half that amount would aggregate a substantial sum.

"At the request of the complainant its cedar logs were separated from its other logs. This was extra sorting. The complainant [defendant] may have done similar sorting for other owners, but did not do it for all the other owners. The amount of cedar sorted cannot be definitely stated from the testimony. It may not have been a large amount. But, whether the services occupied much or little of the time of the defendant's employees, it was, to the extent it was given, a valuable service put on the logs of the complainant and not on the logs of all other owners. The defendant not only is entitled, but the observance of uniformity requires that it exact credit for such extra sorting.

"The defendant's credit must also include a reason-

able profit on its business. Whether we may take into account the risk of injury to employees, the work is extra hazardous—and of the breaking up of rafts and the loss of logs through the carelessness of employees, of imperfection of appliances, against which even the prudent cannot always guard, as well as a fair rate of interest on the money invested, or are confined to a fair rate of interest on the money employed on the work (outside the investment on pockets and booms which are taken care of by rents) the allowance would represent a considerable sum.

"And what shall be said of the under charge in 1904 and 1905? The total amount paid for booming and rafting in 1904 was 56 cents and in 1905 was 66 cents. It is admitted the boomage cost in both years was fifty cents. The charts show the cost of rafting, outside the rent of facilities, to have been .1686 in 1904 and .1793 in 1905. The result was that, in the two years, the complainant paid for the service on its logs $557.39 less than what it actually cost the defendant.

"It must be clear that the complainant cannot, in a court of equity, have these accounts, which were supposed to be concluded by contract, re-written upon the basis of a reasonable charge for the service, without being compelled to pay, at the time it receives, what is reasonable. The complainant may not demand equity and at the same time refuse to do equity. In any equitable adjustment of these accounts, every under charge, as well as every over charge, must be considered.

"The object of this review is not to show an indebtedness from the complainant to the defendant, but the failure of the complainant to show by a preponderance of the evidence as it is required—an indebtedness from the defendant to it.

"The question in this case which especially challenges interest, is whether, under any circumstances, and if so, whether under the circumstances disclosed by the proofs, this court would be justified, by the indirection of its injunction, to the defendant in restraining the trial of, and rendition of judgment in, the suit pending in the Marinette circuit court.

"It was held in *Carroll* v. *Mechanics' Bank*, Har. Ch. (Mich.) 197, that injunction will not issue from

the courts of this State to enjoin the plaintiff from prosecuting a suit commenced and pending, in a court of a sister State. On dissolving ·such an injunction it was there said:

" 'It has been repeatedly decided that courts of chancery will not sustain an injunction bill to restrain a suit or proceeding previously commenced in a court of a sister State. *. * * The affidavit discloses the fact that the· injunction allowed in this cause purports to restrain the proceedings of a cause not only at issue, but pending in the court of another State. * * * This being apparent there can be no room for doubt as to the duty of the court, so far as to modify the injunction to divest it of this anomaly. * * * The prompt correction of this error is called for by a decent regard for the reputation of the court and the judicial proceedings of the State.'

"The doctrine of that case, which was decided about 1840, has never ·been questioned before the Supreme Court of this State and is supported by the decisions of other courts. *Mead* v. *Merritt*, 2 Paige (N. Y.), 402; *Harris* v. *Pullman*, 84 Ill. 20; *Lockwood* v. *Nye*, 58 Am. Dec. 76 (2 Swan [32 Tenn.], 515) ; 11 ·Cyc. p. 1018, note 49.

"A line of decisions will be found which hold that when the parties reside in the same State, equity will interfere to restrain one of them from prosecuting a suit commenced by him in the courts of another State, when it clearly appears the prosecution of such suit to judgment or decree would result in oppression or fraud. But running all through those cases, will be found the determination of the courts, not to break over the rule of comity and policy which forbids the granting of injunction to stay proceedings in a suit, which has already been begun in a court of competent jurisdiction of a sister State, except where the circumstances are very special, where there exists, not ordinary, but some peculiarly equitable grounds for so doing. *Burgess* v. *Smith*, 2 Barb. Ch. (N. Y.) 276; *Bank of Bellows Falls* v. *Railroad Co.*, 28 Vt. 470.

"Situations will arise where litigations between residents of the same State, conducted to a conclusion in the courts of another State, will operate so oppressively as to shock the conscience of equity. To prevent such results courts of equity should have power.

But the only satisfactory doctrine, because the only doctrine compatible with the dignity of the courts of the country and the orderly administration of justice everywhere, would be to hold the court in which the objectionable suit was commenced, and that court only, entitled, at the instance of the aggrieved party, to refuse to proceed further with the suit, where it appears the object of the plaintiff was to evade the law of the State of his residence, and upon view of the facts and the laws of the State of the residence of the parties, applicable thereto, the court is convinced the prosecution of the suit pending before it, to judgment or decree, would result in giving the plaintiff an unconscionable advantage. The only situation which would seem to justify a court of one State, in stopping by its writ of injunction, the prosecution of a case pending in a court of a sister State, would be where the equitable considerations are plain and compelling, and the aggrieved party, through poverty, is utterly unable to present his equities to the foreign court.

"If the rule of the *Carroll Case* is not, and the more liberal rule contended for by the complainant is, applied to the facts of this case, the complainant is in no better position.

"In an effort to bring itself within the rule of the line of cases referred to, the complainant claims the dealings were, and the Wisconsin suit, to all intents and purposes, is, between Michigan corporations; and that the service involved in the controversy were put on the logs in Michigan, under an applied contract which arose in Michigan. In none of these claims is it supported by the proofs, and, if they were all true, it has failed to prove a case showing any equities in its favor, much less a case justifying the exercise of the extraordinary jurisdiction involved in this application.

"Respecting the domicile of the defendant the situation is unusual. The effect of the consolidation of the Michigan and Wisconsin corporations was not to create a single corporation in both States but to create a separate corporation in each State, owing its existence to the law of that State and that State only. In Michigan the defendant is regarded as a corporation of, and as having its existence and domicile in Michigan where in Wisconsin it is regarded as a corpora-

tion of and as having its existence and residence in that State. *Chicago, etc., R. Co.* v. *Auditor General*, 53 Mich. 79; 2 Clark and Marshall Private Corp., § 362 and notes. The decisions, both State and Federal, are numerous, and, as far as observed, unanimous, to the conclusions that, for all purposes of jurisdiction the consolidated corporation is to be considered a corporation and citizen of the State where it is found, or where it sues. 1 Clark & Marshall Private Corp., § 117, note 14. While, therefore, the corporation before this court is a corporation of, and is domiciled in, this State, that fact furnishes no ground for the position that the complainant is being proceeded against by a Michigan corporation, in the courts of Wisconsin.

"In legal effect the consolidation of these companies amounted to no more than permission to have the same membership, to be controlled and managed by the same officers, and to pool their earnings coupled with the duty to respond to the extent of their property and resources, in discharge of all obligations contracted by either. Each corporation is entitled to exercise in the State of its creation the powers there granted to it, but it is not entitled to exercise these powers or any power in the State which created the corporation with which it has consolidated. The authorized activities of these corporations stop with the boundary line between the two States. The corporation before this court did not commence, cannot discontinue, or act, in relation to the Wisconsin suit, in any way. The effort of the complainant, if successful, would not be to restrain the corporation before the court, from prosecuting the Wisconsin suit, but to compel the Wisconsin corporation to forego the prosecution of a suit lawfully commenced by it in the State of its creation.

"Wherever it is sought to enjoin a suit commenced in the State of its creation, by a corporation which has lawfully consolidated with the corporation of another State, and the domicile of the corporation bringing the suit is important, its domicile must be held to be in the State of its creation, regardless of the court or State where the question is raised.

"Both parties accede to the ruling in the *Spies Case*

that, for want of lawful authority for the rates therein specified, the written acceptance by the complainant of the rates and terms set forth in its letter of the defendant, did not constitute a contract for the driving, sorting, rafting and delivery of the logs. There was an implied contract to that effect which arose by the delivery to, and acceptance of the logs, by the defendant. The place where the contract was made was the place where the logs were delivered and accepted. They were delivered afloat and partly in Michigan and partly in Wisconsin and, in being passed through the boomage ground, as well as in transit down the river, they were first on one side of the river and then on the other. This we know of common knowledge. If, therefore, the place where the contract was made or performed, has a bearing it appears that the contract, as to some of the logs was made in Wisconsin and the service upon all of them was performed, partly in Wisconsin.

"By pleading the alleged excess as an off-set or counter-claim, in the Wisconsin suit, the complainant in effect, commenced, in that court, a suit to recover such excess, which has not been discontinued. That course should be reason, sufficient in itself, to deny the injunction sought in this case.

"The Wisconsin court has not passed on the question, but it is conceded by counsel, and for the purposes of this decision it will be assumed, that the claim for the excess, having accrued six years before the commencement of the Wisconsin suit, is barred by the statute of limitations of that State. The claim did not, however, accrue six years before the defendant's right of action accrued, and, consequently, had the defendant sued on its demand in Michigan, lapse of time would not have been a bar to the presentation of the complainant's claim by way of off-set. 3 Comp. Laws, § 9746 (3 Comp. Laws 1915, § 12337) ; *Busch* v. *Wilcox*, 106 Mich. 514.

"The purpose of this suit is to give the complainant the same advantage it would have if the Wisconsin suit is discontinued and a suit is brought by the defendant, on its demand, in Michigan. To that end, and on the naked proposition that the complainant has

203—Mich.—3.

a claim which it could have, but failed to sue, in Michigan or Wisconsin, any time during six years, and which it cannot now enforce unless the defendant is coerced into bringing an action on its demand in Michigan, this court is asked to interfere with the orderly progress of a suit pending in a court of another State, without showing the defendant, in any way, responsible for the situation; or that the situation has not arisen through the neglect of the complainant.

"It is well settled that where an adequate remedy at law has been available and has been lost by negligence, or merely failure to seek it at the proper time, equity will not interfere to grant relief. 16 Cyc. pp. 38-40.

"Equity is not solicitous for those who sleep on their rights. An appeal to equity cannot be made on the ground that the complainant has lost its right to sue in Michigan or Wisconsin, unless, at least, it was prevented from suing by accident or fraud. And where relief is permissible on the ground of accident or fraud, to obtain relief the complainant must affirmatively show that the loss of legal remedy was occasioned by such matters of equitable excuse, unmixed with negligence on its part. 16 Cyc., pp. 39-40.

"In the spring of 1908 the complainant protested against the rate for that year, which was the same as the rate for 1906, and within 4 cents of the rate for 1907. It retained an attorney to appear, and who did appear at a meeting of the directors of the defendant and gave emphasis to such protest. The objections which were presented at that time were equally applicable to the 1904-7 rates, although no request was then made to disturb 1904-7 settlements. Whatever may have been the fact earlier, that its attorney and officers did not then know all the material facts, including the Wisconsin statutes on the subject of rates, is not seriously claimed. They knew of, and practically joined in, the protest of the Spies Lumber Company, and of the suit of that company and the claims upon which it was based. Plainly, ignorance of fact or law, played no part in the failure of the complainant to earlier enforce its alleged claim. Except to mail a letter to the defendant February 24, 1912, over six years after the last of the 1904-7 payments

had been made, requesting credit for alleged excessive charges in those years, no effort of any sort to collect, and no attempt of any sort to enforce the demand, was made until after the commencement of the Wisconsin suit. The record is barren of any evidence upon which to found a claim that the complainant was induced to non-action by any promise, representation, or conduct of the defendant or its officers. The secretary of the company gave as a reason for the defendant not suing earlier, a supposed understanding that the boomage and rafting charges entered against the complainant in 1908 and subsequent years, would be settled upon whatever basis was held proper in the Spies suit. But he did not, nor did the complainant's officers say there was any such talk or understanding regarding the 1904-7 accounts, concerning which no question was raised at any time until the mailing of the complainant's letter of February 24, 1912.

"With the exception of a director or two, the officers of the defendant resided at Marinette. Let it be assumed without deciding the question, that service could not have been made on a director. Service of process does not require the residence, but the presence, of the proper officer in Michigan. An attempt to make that showing would have failed. Menominee and Marinette, separated by a narrow stream, are connected by two bridges. In a business way and socially they are practically one town. The business of the defendant was largely with Michigan mills. Its operations necessitate the frequent presence of its officers, agents and superintendent, on both banks of the river. Bent on business or social affairs, their officers and agents were a familiar sight on the streets of Menominee. If the complainant encountered difficulty in serving the process in this case there were special reasons for it.

"Furthermore, the claim which totals about $3,800, could have been enforced by attachment. The record is undisputed that in and ever since 1904, the defendant has owned real estate in the city of Menominee, subject to levy and sale on execution, and valued on the assessment roll of the city of $30,000.00.

"The foregoing, or any, discussion of the complainant's ability to get service or enforce its claim is idle.

The complainant is estopped from denying it could have obtained service. That the statute of limitations has run against a suit at law, by the complainant in Michigan, is the theory of the bill. It is the sole foundation of the bill. It is the only excuse which the complainant could possibly offer, and the only excuse which it does offer, for the commencement of this suit.

"It is objected that the complainant would not, in any event, be entitled to offset its claim because it is not liquidated. Its claim, if it has any, is unliquidated. This point was good when this suit was commenced, but, should the defendant be now enforced to sue in Michigan, the unliquidated condition of the claim would not prevent the off-setting thereof. Cummins & Beecher Judicature Act, § 591 (3 Comp. Laws 1915, § 12468).

"The defendant takes the further position that the payment of the 1904-7 accounts were voluntary and are not recoverable, in whole or in part, for that reason. The complainant contends they were not voluntary because of its ignorance of the material fact that a maximum boomage rate was fixed by the Wisconsin statute.

"In dealing with this question it is necessary to keep in mind that the services rendered by the defendant were of two kinds, viz.: the sorting and delivery, otherwise called the 'booming,' of the logs and the rafting of the logs. The boomage rate is limited to what is reasonable by a Michigan statute and to 50 cents per thousand feet by the Wisconsin statute. There is no statute in this State or in Wisconsin, limiting the rate to be charged for rafting. The defendant is not required by its charter to raft the logs. That was a service which it was at liberty to render or refuse to render. That service which is voluntarily assumed it was authorized to discontinue whenever it sees fit, or perhaps on a reasonable notice to its patrons to avoid losses. The parties had a right to contract for that service and a contract rate would stand, whether it represented more or less, than a reasonable return to the defendant for its investments, expenses and risks. The defendant is held here to a reasonable rate for rafting not because any statute says a reasonable rate must be applied, but because,

finding no contract covering a rafting charge specifically, compensation can be measured only by what the service is found to have been reasonably worth. The complainant is not seeking to recover back overpaid boomage charges, but overpaid rafting charges. If the rafting charges had been separate from the boomage charge when paid, so that the complainant knew the amount of rafting charge, there would be no difficulty, under the facts of this case in holding the complainant to a voluntary payment. And this would be so, even if, growing out of the situation of the parties, the common-law duty rested on the defendant to raft the logs and for a reasonable compensation.

"The argument is that, being ignorant of the Wisconsin limit respecting boomage charges, the officers of the complainant did not know the charge beyond fifty cents was for rafting and they were, therefore, unable, at the time of payment, to judge whether the rafting charge was reasonable or otherwise.

"The officers of the complainant were familiar with the operations conducted by the defendant in the boomage ground, and the nature and the extent of the work put on the logs of the complainant and on those of all other owners. The complainant knew the Michigan law, at least, required that the boomage rate be both reasonable and uniform; and that the rates, from year to year, were not uniform. It contracted for the defendant's services on that plan, and paid the rates without objecting for a long period of years. Such a length of acquiescence justified the defendant in assuming the plan was satisfactory and no doubt had its effect in leading the defendant to deal with others along the same lines. That when it paid the 1904-7 accounts, it knew all it was necessary to know to safeguard its rights, except Wisconsin rate statute, is not denied. It does not claim it supposed the boomage rate which entered into the total charge for either of those years exceeded fifty cents. Without it entertained that belief, it is difficult to fathom how its want of knowledge of the Wisconsin statute affected the situation.

"The Wisconsin statute was not hidden by the defendant. Ordinary business prudence would have

prompted the officers of the complainant to have them examined for what they provided regarding rates. If they were not at hand in Menominee, they lay at the other end of the bridge which the complainant's officers frequently crossed.

"Whether a party should be held relieved from the effect of payment, by setting up ignorance of a material fact, which was discoverable on slight effort, and which the ordinarily prudent, in his situation, would be expected to investigate, is a point which the authorities presented do not quite cover. How the point would be ruled in an action at law, or in a court of equity where the common jurisdiction of equity was only involved, it is unnecessary to speculate. Culpable ignorance of a material fact should not avail as a basis for the exercise of the jurisdiction of equity herein invoked. That the complainant paid an account in ignorance of a fact which was open to the light of day during the fifteen years or more, in each of which it paid similar accounts, and which, if common prudence had been exercised, it would have known, would be a poor excuse to give a foreign court for the reflection on its integrity, or on the justice of the laws of its State, with which an injunction staying its proceedings, unavoidably, would be tainted.

"A decree will be entered dismissing the bill of complaint with costs in favor of the defendant, to be taxed."

Counsel have filed very elaborate briefs. In appellant's brief we find the following criticism:

"Referring to the opinion of the learned circuit judge, in whose opinions we usually find great force and logic, we must say in this case we are baffled at both his arguments and conclusions, and can find no other explanation therefor than that, from some cause, he overlooked much in both pleadings and evidence. We therefore refer to his opinion in confidence that this court will conclude that in many features thereof it is erroneous.

"The opinion seems, at almost the outset, to show the court did not have in mind the location or identification of the rafting gaps. This error alone is suffi-

cient to rend asunder his whole treatment of the subject of 'rafting.' "

Following this criticism, counsel quote the testimony of two witnesses, one of whom places these gaps between figures 9 and 10 of the blue print, and the other between figures 10 and 11. The last of these witnesses explained in detail the work of separating the logs and an examination of the record we think justifies the description of the judge of the operation pursued. Other criticisms of the statements of the judge as to what the evidence shows have been examined, and we do not find them justified by the record, but even though the trial judge was mistaken as to some of the unimportant details it is evident he was not mistaken as to the essential and controlling facts.

A careful examination of the somewhat voluminous record and the reading of the able briefs of counsel satisfy us that the case presented by the plaintiff would not warrant the interference of a Michigan court of equity, with the law case in Wisconsin and the granting of the relief prayed, for the reasons stated by the trial court in his opinion.

The decree is affirmed, with costs to the defendant.

OSTRANDER, C. J., and BIRD, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.